**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bulmaro TORRES–SANCHEZ,**
**Defendant–Appellant.**

No. 95–10209.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1996.

Decided May 13, 1996.

N. Patrick Flanagan, III and Elizabeth N. Farley, Beckley, Singleton, Jemison & List, Reno, Nevada, for defendant-appellant.

Jamon A. Jarvis and Daniel G. Bogden, Assistant United States Attorneys, Reno, Nevada, for plaintiff-appellee.

Before: BROWNING and JOHN T. NOONAN, Jr., Circuit Judges, and MERHIGE, Senior District Judge.*

MERHIGE, Senior District Judge:

Bulmaro Torres–Sanchez ("Sanchez") appeals his jury conviction for possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), and travelling in interstate commerce in aid of racketeering, 18 U.S.C. § 1952(a)(3). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294(*l*). We AFFIRM.

### I.

On November 24, 1994, at approximately 6:30 a.m., Elko County, Nevada, Deputy Sheriff Ernie Sardella ("Sardella") initiated a traffic stop on a Chevrolet pickup truck travelling near the Idaho/Nevada border. He stopped the truck for speeding, having no license plates, and having illegally tinted side windows.

Sardella made initial contact with the driver, co-defendant Avila–Soriano ("Avila"). Also in the vehicle were Sanchez, located in the front passenger seat, and Virginia Padilla

* The Honorable Robert R. Merhige, Jr. Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

("Padilla"), seated in the back of the extended cab truck. Sardella first asked Avila for his driver's license and registration. Avila presented a valid driver's license, but neither he nor any of the other occupants produced valid registration. Therefore, Sardella was concerned that the truck may have been stolen or was being unlawfully used.

Sardella claims that Avila was extremely nervous when handing over his license. Sardella testified at the suppression hearing that:

the driver seemed very scared at that time .... when he handed me his driver's license, his hand was shaking, his eyes were watery, and he looked straight ahead. He kind of had a quiver in his lip. He was really—to me he looked frightened.

Concerned over the lack of valid registration, Sardella inquired as to ownership of the vehicle. In responding to this question, Sanchez and Padilla apparently spoke briefly in Spanish, and then Padilla told Sardella in English, "It's my sister-in-law's vehicle." During this exchange, Sardella noticed (1) a strong smell of cologne in the car; (2) a cologne bottle on the floor of the backseat; (3) a speedometer reading of 19,500 miles; (4) no luggage for any of the passengers; and (5) a small ice chest in the pickup bed of the truck. Sardella then asked the occupants where they were heading. Padilla turned to Sanchez, conversed with him in Spanish, and then both passengers answered "Twin Falls, Idaho."

At this point, Sardella returned to his patrol car and ran a check on Avila's driver's license. The license came up clear, but Sardella was still unable to determine ownership of the vehicle. Therefore, he returned to the truck for further questioning. Sardella once again questioned the occupants about the truck's ownership. This time Padilla allegedly responded that it belonged to Sanchez's sister-in-law. This concerned Sardella, as the statement was inconsistent with her previous answer that it was her sister-in-law's truck. Sardella, however, admitted at the suppression hearing that it was "very possible" he could have misunderstood Padilla's first response to this question.

Sardella then asked Sanchez for his sister-in-law's name. After allegedly "pausing for quite some time," Sanchez responded, "Estella Medina." This was the first indication to Sardella that Sanchez could converse in English. Sardella did confirm that Estella Medina was the name on the temporary new vehicle dealer's notice in the right front window. At trial, Estella Medina testified that she was Sanchez's sister-in-law and had given him permission to use the truck.

Sardella then told the occupants that he was not going to cite them, warned them to watch their speed, and told them to inform the owner that the tinted windows were prohibited in Nevada. He further explained, however, that he still had questions about ownership of the vehicle. At the suppression hearing, Sardella testified that he believed he had two different stories on who owned the truck, and "the more questions [he] asked the more suspicious [he] became."

At this point, Sardella asked Sanchez if he would mind coming back to his patrol car. Sanchez agreed, and as they approached the patrol car, Sardella stated, "Let's sit up inside, it's cold, get you out of the weather." Sanchez responded, "sure ... it's real cold." Once both men were seated in the front of the patrol car, Sardella returned Avila's driver's license to Sanchez. He then began to question Sanchez about the purpose of their trip, the ownership of the vehicle, whom they were visiting, and his relationship to the other occupants. Sanchez responded that he was from Riverside, California, that none of the occupants had ever been to Idaho, and that they were travelling to Twin Falls, Idaho, to see his aunt for a day or two. Although Sardella admitted Sanchez was "very cooperative," his suspicions were increased by many of Sanchez's statements.

First, although Sanchez produced a telephone number for his aunt, he did not have her address. Sanchez also admitted to Sardella that Avila had never been to Twin Falls before. This admission was inconsistent with Sanchez's earlier statement that Avila was driving because he was familiar with the route to Twin Falls. Furthermore, unlike the initial questioning where Sanchez appeared to speak almost no English, Sardella

claims that Sanchez understood what he was saying while in the patrol car.

Somewhere between seven and nine minutes into his questioning of Sanchez, Sardella left Sanchez in the patrol car and asked Deputy Hester, who had arrived on the scene, to remain with Sanchez while he, Sardella went back to the pickup truck. Sardella decided to return to the truck for further questioning, in order to "get the facts straight." He engaged Padilla in general conversation, asking her how long she had known Avila. She responded that she had just met Avila "today," but had known Sanchez for ten or eleven years. Sardella testified that it made him "a little suspicious" to find out she had just met Avila that day. When Sardella asked Padilla further questions about their travel, he claims that she "seemed kind of confused," and stated, "I think we're going to visit some of his relatives." However, she did not know exactly which relatives they were going to visit. Sardella found it strange for these individuals to be travelling from California, without luggage, unsure of exactly whom they were visiting, and with no address of their final destination.

Sardella then asked Padilla whether there were any guns, cocaine, marijuana, etc. in the truck. Her reply to each of these questions was, "No, not that I know of." He then asked whether she had any problem with him searching the truck. Padilla allegedly responded in a confident manner, "No, none at all . . . it's not my vehicle."

At this point, Sardella returned to his patrol car, and asked Sanchez whether there was illegal contraband in the vehicle. Sanchez replied that there was not, but did mention that there might be $600.00 in cash. Sardella's police report indicates that when he asked Sanchez whether there was any cocaine in the vehicle, Sanchez looked away, and with a nervous voice replied, "No, nothing like that." He also apparently avoided eye contact when asked about marijuana and money. Sardella then asked Sanchez if he minded him searching the vehicle. Sanchez's first response was, "I don't understand." Sardella explained, "Do you mind if I look and search in the vehicle," this time emphasizing the word "*search.*" Sanchez allegedly responded, "Yeah, go ahead, if you want to."

Sardella returned to the truck and instructed Avila and Padilla to leave the vehicle and walk back to his patrol car. At approximately 6:55 a.m., Sardella began a systematic search of the vehicle and located a wrapped bundle within the center console. The bundle was later determined to be the drug methamphetamine. All three defendants were arrested, and Sanchez and Avila eventually indicted.

In his police report, Sardella noted twelve factors which gave him reasonable suspicion that the truck was being used in an illegal activity. They are as follows:

(1) Avila, more than just nervous, appeared scared. Sanchez was nervous at first.

(2) Strong masking smell of men's cologne. Bottle on rear floor.

(3) High miles on recently purchased vehicle.

(4) Registered owner not present, no ownership papers.

(5) Padilla saying pickup was her sister-in-law's and then changing story later. Padilla not knowing destination of travel or sure of reason for trip.

(6) It was mentioned Avila was along for trip because he knew the roads, but further investigation revealed all three were making trip to Idaho for first time.

(7) No luggage for such a long trip.

(8) Origin of Southern California.

(9) Padilla stated she had met driver that day, for the first time.

(10) Sanchez acting like he spoke no English, but when he felt like he was free to go he spoke good English.

(11) Sanchez could not give officer his Aunt's address in Twin Falls, Idaho.

(12) Prior experience in highway drug interdiction.

Sanchez and co-defendant Avila were indicted on December 7, 1994, for violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute methamphetamine (Count I), and 18 U.S.C. § 1952(a)(3), interstate travel in aid of racketeering (Count II). Counts I

and II also included violations of 18 U.S.C. § 2, aiding and abetting.

On December 30, 1994, co-defendant Avila filed a motion to suppress. On January 6, 1995, Sanchez filed his motion to suppress. Sanchez then joined in Avila's motion on January 13, 1995. The district court heard both motions at an evidentiary hearing held on January 20, 1995. At this hearing, the district court denied both motions. The court ruled from the bench as follows:

> The officer's concern was that the registered owner of the automobile avails nothing to the officer at the scene. The officer's concern was that the registered owner was not in the vehicle. The person whose name was on the temporary slip, the person whose name was on the dealer papers was not there, that is what made him suspicious.
>
> The recent evidence of a spraying to provide an overlay of some odor in the vehicle, the absence of luggage on a long trip, Mr. Sanchez's nervousness when asked about drugs, the high mileage on the car that is but a few months old, certain inconsistent answers to questions and a lack of knowledge as to the purpose of the trip, the driver's nervousness, and the point I think that it was reasonable for the officer to assume that Mr. Avila was driving only as an accommodation to Mr. Sanchez, that the officer felt he had the consent of the important persons, all tell me that the search was reasonable and therefore it is not suppressed, and the motion to suppress is denied.

Sanchez and Avila were tried together before a jury. Sanchez was found guilty on both counts of the indictment. On April 27, 1995, Sanchez was sentenced by the district court to concurrent sentences of 121 months on Count One and 60 months on Count Two. Sanchez filed a timely notice of appeal on May 4, 1995.

**II.**

■ Sanchez challenges the district court's denial of his motion to suppress. He appropriately concedes that Sardella's initial stop of the vehicle, his opening questioning, and his request for license and vehicle identification were all lawful under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, Sanchez argues that once moved to Sardella's patrol car for further questioning, what started out as a valid *Terry* stop became a *de facto* arrest. The determination of whether a seizure exceeds the bounds of a *Terry* stop and becomes a *de facto* arrest is reviewed *de novo. United States v. Harrington*, 923 F.2d 1371, 1373 (9th Cir.), *cert. denied*, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991).

■ There is "no bright-line for determining when an investigatory stop crosses the line and becomes an arrest," *United States v. Hatfield*, 815 F.2d 1068, 1070 (6th Cir.1987), and this determination "may in some instances create difficult line-drawing problems." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Furthermore, "there is no per se rule that detention in a patrol car constitutes an arrest." *United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir.1988); *see also United States v. Kapperman*, 764 F.2d 786, 792 (11th Cir.1985) (no arrest when police moved defendant to nearby area in patrol car); *United States v. Manbeck*, 744 F.2d 360, 377–78 (4th Cir.1984) (holding placement of suspect in patrol car acceptable where inclement weather provided no other alternative), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). However, "detention in a patrol car exceeds permissible *Terry* limits absent some reasonable justification." *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir.1990). We have previously explained that when determining whether an arrest has occurred, a court must evaluate all the surrounding circumstances, "including the extent to which liberty of movement is curtailed and the type of force or authority employed." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987). In evaluating the reasonableness of an investigatory stop, courts are to investigate:

> whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

Sanchez initially argues that Sardella's questions were not "reasonably related in

scope to the circumstances which justified the interference in the first place." *Id.* He claims that once "detained" in the patrol car, Sardella asked questions that were clearly unrelated to the truck's registration, and therefore, not reasonably related in scope to the reason for the initial stop. We reject this argument.

First, Sardella's purpose in asking Sanchez to return to the patrol car was merely to confirm or dispel his suspicion about ownership of the truck. Faced with nervous occupants, pulled over for having no license plates, who could produce no valid registration papers, and who gave apparently conflicting stories as to ownership, Sardella had reasonable suspicion to believe the vehicle was stolen. Therefore, Sardella's separation of Sanchez from the other occupants, in order to compare their stories, was reasonable under the circumstances. Once inside the patrol car, Sanchez failed to dispel Sardella's suspicions about illegal activity and actually created new ones. Therefore, we find that Sardella had well-founded suspicion to question the occupants about their intended destination and whether they were carrying illegal contraband, and we reject Sanchez's argument that this line of questioning exceeded the scope of the purpose for the original stop. *See United States v. Head,* 783 F.2d 1422, 1425 (9th Cir.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986)(officers can continue to detain defendant during an investigatory stop when their suspicions are heightened in order to confirm or deny these suspicions).

■ Sanchez next argues that the twenty-minute length of his alleged "detention" exceeded the permissible time limitations for a *Terry* stop. He relies heavily on *United States v. Chamberlin,* 644 F.2d 1262 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). In *Chamberlin,* the defendant was questioned in the back of an officer's patrol car for twenty minutes, while the officer drove around looking for the other suspect. We held that the twenty minute detention was a "custodial interrogation" rather than an "investigatory stop," and therefore, probable cause was required. *Id.* at 1265–67.

In reaching this decision, we noted that the officer never advised the defendant that he was free to leave, and he detained the defendant to "find out what was going on." *Id.* at 1267. Our decision was also clearly influenced by the fact that the officer admitted that the defendant was never free to leave his vehicle. *Id.* Furthermore, it would have been impossible for the defendant to exit a patrol car that was in pursuit of another suspect.

Sanchez argues that like the defendant in *Chamberlin,* he was placed in a patrol car for twenty minutes, was never informed that he was free to leave, and was moved so the officer could further investigate his suspicions of illegal activity. He also argues that none of the "reasonable justifications" for placing a suspect in a patrol car were present in this case, noting that Sardella had no reason to believe he would flee or was holding dangerous weapons. *Ricardo D.,* 912 F.2d at 341. Additionally, Sanchez points out that he was "very cooperative" and that none of the truck's occupants made any "furtive movements." *Id.* Therefore, Sanchez maintains that under the totality of circumstances, he was not free to leave, and his "detention" was equivalent to an arrest. We disagree.

*Chamberlin* presents a very different factual setting from the present case. Unlike the defendant in *Chamberlin,* Sanchez was never *required* to sit in the patrol car, rather, it was suggested to him by Sardella because of the cold weather conditions. Additionally, Sanchez was never removed from the scene or driven around in the patrol car in pursuit of another suspect. Instead, Sanchez voluntarily entered the patrol car and was free to leave after Sardella made routine questions to determine if criminal activity was afoot.

■ In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court specifically refused to set a definitive rule on the time limit of a lawful investigative stop, finding instead that the circumstances of each case must be considered. The Court explained that rather than using rigid criteria to determine whether an investigative detention is unreasonable,

"common sense" and "human experience" must govern. *Id.* at 685, 105 S.Ct. at 1575. The critical inquiry is whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575. "Brevity" can only be defined in the context of each particular case. *See United States v. Place*, 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983) ("Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.") The Court has further explained that "[i]f the purpose underlying a *Terry* stop-investigating possible criminal activity-is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*." *Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981).

In attempting to confirm or dispel his suspicions of illegal activity, Sardella used no threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics. *See United States v. Hickman*, 523 F.2d 323, 327 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976)(purpose of investigatory stop is to allow officer to confirm or dispel suspicions through reasonable questions); *United States v. Head*, 783 F.2d 1422, 1425 (9th Cir.), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986)(officer can continue to detain a defendant during investigatory stop when his suspicion is heightened, in order to deny or confirm suspicions). His purpose in questioning Sanchez was to clear up appropriate questions about ownership of the truck. We have previously found no "arrest" in situations where far greater restraints have been placed on suspects during an investigatory stop. *See United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir.1990) (no arrest when defendant ordered out of car at gunpoint), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (no arrest when defendants "forced

from their car and made to lie down on wet pavement at gunpoint"); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (no arrest when suspect removed from car at gunpoint and ordered to prone-out on ground).

In this case, Sardella was in the process of investigating a vehicle that was being driven without license plates, and by occupants who could produce no valid proof of ownership. He then observed numerous suspicious factors that, based on his experience, required him to further investigate whether the occupants were participating in criminal activity. Sardella's subsequent request for Sanchez to return to his patrol car was merely a continuation of his initial investigatory stop, in an attempt to dispel or confirm his suspicions of criminal activity. Therefore, upon review of the totality of the circumstances, we find Sanchez being seated in Sardella's patrol car for twenty minutes to be reasonable, and we hold that this valid Terry stop never rose to the level of a *de facto* arrest.

### III.

■ An individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person, property, or premises. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Sanchez initially argues that his consent to search the vehicle was invalid, because it resulted from an illegal arrest. We reject this argument, having already decided that there was no illegal arrest.

■ We also reject Sanchez's argument that his consent was involuntary. *United States v. Castillo*, 866 F.2d 1071, 1082, (9th Cir.1988). In *Castillo*, we set out various factors to consider in determining whether consent was voluntary, including: (1) whether defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether Miranda warnings had been given; (4) whether the defendant was told he has a right not to consent; and (5) whether the defendant was told a search warrant could be obtained. Whether a consent to search was voluntary is a question of

fact that is based upon the totality of the circumstances surrounding the giving of the consent. *United States v. Al–Azzawy,* 784 F.2d 890, 895 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Alfonso,* 759 F.2d 728, 740 (9th Cir.1985).

While Sardella gave no Miranda warnings, never informed Sanchez of his right to refuse the request for consent, and never explained that a search warrant could be obtained, the absence of these warnings does not invalidate the consent. As the *Castillo* Court explained, the fact that some factors are not established does not automatically mean that the defendant's consent to search was not voluntary. *Id.* at 1082.

Sanchez was not under arrest at the time consent was given. Therefore, Miranda warnings were not necessary. Sardella requested consent only after Sanchez's answers failed to dispel and, in fact, heightened his suspicions of criminal activity. Furthermore, no guns or other signs of force were ever used to coerce consent from Sanchez. Sardella repeated his request for consent on three separate occasions and emphasized that he would be "searching" the entire vehicle. Therefore, upon review of the totality of the circumstances, we hold that Sanchez's consent to search the pickup truck was voluntary.

## IV.

Sanchez's argument that the investigatory stop escalated into a *de facto* arrest, as well as his contention that his consent was not voluntary lack merit. Accordingly, his conviction is **AFFIRMED.**