220 F.3d 1010 (9th Cir. 2000)
 YONG HO CHOI, Plaintiff-Appellant,
v.
RANDALL GASTON, Anaheim Chief of Police; CITY OF ANAHEIM; D.O. HELMICK, California Highway Patrol Commissioner, sued only in his individual capacity; CALIFORNIA HIGHWAY PATROL, Fifty Unknown Named Officers and/or employees; MARK BRUCKS, Anaheim Police Officer; CHRISTOPHER MARSHALL, Anaheim Police Officer;BRYAN SANTY, Anaheim Police Officer; BRADLEY THURMAN, Anaheim Police Officer; FRANK HARRIS, Anaheim Police Officer; JOE REISS, Lt., Anaheim Police Officer; DAVID DAVIS, Anaheim Police Officer; BRIAN CARRION, Anaheim Police Officer; DAVID COMSTOCK, Anaheim Police Officer; RON C. BRAME, CHP Officer; WILLIAM LONG, CHP Officer;
STERLING SECHRIST, CHP Officer; JOSE DIAZ, CHP Officer; ANNE JOHNSTON, CHP Officer, Defendants-Appellees.
 No. 98-56854
 Office of the Circuit Executive
U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted May 1, 2000
Filed August 8, 2000
 
 Marion R. Yagman, Yagman & Yagman, P.C., Venice, California, for the appellant.
 Mark S. Gordon (briefed & argued), Deputy City Attorney, Jack L. White, City Attorney, Anaheim, California for appellees City of Anaheim, Gaston, Brucks, Marshall, Santy, Thurman, Harris, Reiss, Davis, Carrion and Comstock.
 Leonard Pape (briefed & argued), Deputy Attorney General, Attorney General of the State of California, Los Angeles, California, for appellees Helmick, Brame, Sechrist, Long, Johnston and Diaz.
 Appeal from the United States District Court for the Central District of California, Gary L. Taylor, District Judge, Presiding; D.C. No. CV-96-00830-GLT
 Before: James R. Browning, John T. Noonan, and Barry G. Silverman, Circuit Judges.
 OPINION[1]
 PER CURIAM:
 
 
 1
 This is an appeal from summary judgment. We affirm in part and reverse in part.
 
 
 2
 Choi sued defendants for various violations of his constitutional and statutory rights arising from defendants' actions in detaining and arresting him during their search for a suspect in the shooting of an officer of the California Highway Patrol (CHP).
 
 
 3
 Violation of the Fourth Amendment. Summary judgment for the Anaheim officers who detained Choi was inappropriate. The district court erred in holding that "reasonable minds could not differ as to the validity and reasonableness of Plaintiff's stop, detention and arrest."
 
 
 4
 Choi contends the Anaheim officers did not have reasonable suspicion or probable cause but rather detained and arrested him "because he was Asian." The officers, in contrast, assert their conduct was justified because "Choi's physical appearance and clothing fit the description of the suspect."
 
 
 5
 Sufficient evidence is offered on both sides to create a jury question as to the reasonableness of the officers' conduct.
 
 
 6
 When the officers first apprehended Choi they were presented with the following facts: (1) Choi was next to a man who was seen running from the direction of the CHP vehicle the suspect stole from his victim; (2) Choi's clothing was similar to the suspect's, although not identical; (3) Choi was shorter and significantly older than the suspect; (4) Choi was Korean while the suspect was Vietnamese. When defendants took Choi into "custody," only minutes later, they removed Choi's wallet and discovered that his name did not match the suspect's.
 
 
 7
 This evidence is sufficient to give rise to a jury question regarding whether the officers had reasonable suspicion to stop Choi or probable cause to arrest him, or instead acted on the basis of racial profiling. See Terry v. Ohio , 392 U.S. 1 (1968); McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984) ("[I]n a S 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury."). Furthermore, the evidence is sufficient to raise a jury question regarding when the conduct of the Anaheim officers evolved from a stop into an arrest. See United States v. Torres-Sanchez, 83 F.3d 1123, 1127 (9th Cir. 1996) ("There is no bright-line for determining when an investigatory stop crosses the line and becomes an arrest.") (citation and internal quotations omitted); see also United States v. Del Vizo, 918 F.2d 821, 824-25 (9th Cir. 1990) (concluding that an arrest occurred when officers brandishing weapons ordered the suspect to alight from his vehicle and handcuffed him).
 
 
 8
 Qualified Immunity. When CHP officer Brame assumed custody of Choi, the Anaheim officers informed him that they had seen Choi running from the vicinity of the abandoned CHP vehicle. Although this information was inaccurate, Brame had no reason to question the Anaheim officers' statement. Under these circumstances, it was not objectively unreasonable for Brame to believe there was probable cause to arrest Choi. Qualified immunity therefore protects OfficerBrame. See Alexander v. County of Los Angeles , 64 F.3d 1315, 1319 (9th Cir. 1995).
 
 
 9
 Field Identification Procedure. Choi argues that defendants violated his due process rights by subjecting him to an unduly suggestive field identification procedure. The identification procedure was suggestive in that Choi was viewed in close proximity to a CHP vehicle, thereby giving rise to an inference that he was apprehended in or near the stolen CHP vehicle. Nonetheless, in view of the government's interest in permitting witnesses to identify a suspect soon after the crime, we have rejected due process challenges to similarly suggestive identification procedures. See United States v. Jones, 84 F.3d 1206, 1209 (9th Cir. 1996) (witnesses viewed suspected bank robber surrounded by police officers who were holding up items matching the disguise worn by the robber).
 
 
 10
 The district court properly granted defendants summary judgment as to the field identification procedure.
 
 
 11
 Monell Liability. Choi has not produced sufficient evidence of a custom of Anaheim police officers to arrest persons based on racial or ethnic stereotypes to create a jury question regarding the liability of the City of Anaheim under Monell v. Dep't of Social Services, 436 U.S. 658 (1978).
 
 
 12
 Conspiracy. Summary judgment on Choi's conspiracy claim was appropriate because Choi presented no evidence of an agreement among the defendants to deprive him of his civil rights. See Ting v. United States, 927 F.3d 1504, 1512 (9th Cir. 1991).
 
 
 13
 The Telephone Call. Summary judgment was appropriate on Choi's claim that the defendants violated California Penal Code S 851.5 because Choi did not request a telephone call from either the Anaheim or CHP officers.
 
 
 14
 The judgment of the district court is REVERSED and the case is REMANDED for trial on Choi's first cause of action against the individual Anaheim police officers involved in his stop and arrest. The remainder of the court's judgment is AFFIRMED.
 
 NOONAN, Circuit Judge, concurring:
 
 15
 I concur in the per curiam opinion of the court but think a fuller statement of the facts and of some issues may be helpful.
 
 FACTS
 
 16
 On July 13, 1996, in Fullerton, California, at about 8:59 p.m., a man driving a BMW was stopped by CHP Officer Donald Burt. The man shot Burt. Taking Burt's service revolver and using Burt's CHP vehicle, he drove off. Christopher Marshall, a reserve police officer for the City of Anaheim, heard a police broadcast reporting that there had been an assault with a deadly weapon on a CHP officer and that the officer's weapon was missing and his vehicle stolen. Further police radio broadcasts gave the number of the stolen CHP vehicle as P-38 and described the shooting as "attempted murder." At 9:10 p.m. police radio identified the suspected gunman as a "MV" (Male Vietnamese), "Phu Nguyen, 5' 10", Black [hair] Brown [eyes], 18 years old, wearing a white T-shirt and black pants." At about 9:30 p.m. an abandoned CHP vehicle was reported at Mills Ford in Anaheim.
 
 
 17
 At 9:40 p.m. the police radio reported that the suspect was known to police and that police units were at his residence and at his girlfriend's home.
 
 
 18
 Officer Marshall, together with Anaheim police officer Mark Brucks, drove to Mills Ford and at about 9:41 p.m. found CHP vehicle P-38 in the driveway, its lights on and motor running. As they approached, they saw a man wearing a white T-shirt and colored pants running from the Ford dealership. After identifying the CHP unit, Marshall and Brucks drove in search of the man they had seen running.
 
 
 19
 About two minutes later, at 9:43 p.m., they saw two men standing at the corner of Lincoln and Euclid, about 1/5 of a mile from the Ford dealership. One was amale Hispanic, about 5'8", with dark hair, wearing a white T-shirt and tan colored pants. The other appeared to the officers to be a male "Asian," about 5'7", with dark hair, wearing a white shirtand dark-colored pants. The latter was the present plaintiff, Yong Ho Choi.
 
 
 20
 Choi is a native and citizen of Korea. He was 32 years old. His height is 5', 7". He weighs 145 pounds. At 9:30 the evening of July 13, 1996, he was walking to pick up mail at his former address. He was wearing a striped white shirt, blue jeans, and white athletic shoes. He stopped at the corner of Lincoln and Euclid and pressed the button to activate the crossing light. At this point he was confronted by the two officers. They got out of their car with weapons drawn. They told the two men to put their hands in the air. Choi asked, "What's wrong?" or "What happened?" One officer responded, "Shut the fuck up." Choi was then handcuffed with his hands behind his back and made to lie on the ground. As he lay on the ground, he was asked no questions by the officers. They removed his wallet from his pocket. According to Officer Marshall's report to the Anaheim Police Department, Officer Brucks took the Hispanic, and Officer Harris took Choi "into custody."
 
 
 21
 About three to five minutes later, Ronald Brame, an acting sergeant in the CHP, arrived at Lincoln and Euclid. He had just been at the crime scene and had found Burt mortally wounded. When he reached Lincoln and Euclid he saw several Anaheim police officers and the two handcuffed men. He was told by the Anaheim officers "that these two men were observed running westbound on Lincoln Avenue from the vicinity of the abandoned car." Brame telephoned "CHP personnel" with his information about the two men. He obtained identifications for both men, noting that Choi had been born January 3, 1964 and was described as "Male Black[hair] Brown [eyes] 5-7, 140." CHP personnel told him by telephone to "detain both men." By this time CHP officers William Long, Anne Johnston, and Jose Diaz were present. Bags were put over Choi's handcuffed hands, and Brame put Choi in his vehicle. He drove into a parking lot on the northwest corner of Euclid and Lincoln.
 
 
 22
 At 9:55 p.m. police radio carried a report from Euclid and Lincoln: "Detaining 1 suspect but has different name than our suspect. Seen running from the patrol car." Choi heard a police officer say of him, "That's not the guy. " Sterling A. Sechrist, a sergeant in the CHP, had driven to Mills Ford where someone unidentified brought a security guard, Scott Gore, who said he had seen a man not a CHP officer driving a CHP car south; he had heard of the shooting, thought the man he'd seen was the driver, and believed he could identify him. Sechrist drove Gore to the corner of Lincoln and Euclid. There "officers" told Sechrist that the two men they were holding had been "found near the area of the abandoned CHP car and they fit[ted] the descriptions given by eyewitnesses to the shooting of the man that shot officer Burt." Sechrist told Gore to look through the window of the CHP vehicle where Choi was seated. Gore nodded his head affirmatively and said that this was the man he had seen earlier driving the CHP vehicle on the freeway. At 10:10 p.m. police radio reported: "Scott Gore says he can identify both parties."
 
 
 23
 Choi was placed, still handcuffed, outside Brame's CHP vehicle. A little after midnight two witnesses to the shooting inspected him and declared that he was the man they had seen stopped by Burt. Three other persons who had seen a man leaning over Burt's body identified Choi as that man.
 
 
 24
 Choi was then taken to the City of Fullerton jail by CHP officer Brame. Choi asked to make a telephone call and after five hours was permitted to make one. He was confined in the jail until 9 p.m., July 15. Hung Mai, a Vietnamese, later pleaded guilty to the murder of Officer Burt. On April 19, 2000 a jury recommended that he be sentenced to death.
 
 PROCEEDINGS
 
 25
 On September 4, 1997, Choi filed his amended complaint in this case against CHP officers, the CHP commissioner, Anaheim police officers, Fullerton police officers, and the cities of Anaheim and Fullerton. The district court granted the defendants' motion for partial summary judgment, holding the police had reasonable suspicion to stop Choi and probable cause to arrest him. Thereafter, the district court gave summary judgment for the defendants as to their use of reasonable force, as to Choi's claims under the Eighth, Thirteenth and Fourteenth Amendments, his claim of an impermissibly suggestive field identification procedure, his claim of defamation, his claim of conspiracy, and his state law claims of assault, battery, intentional and negligent infliction of emotion distress, and false imprisonment. The court found it unnecessary to rule on the defendants' defense of qualified immunity. Finally, the court gave summary judgment for the defendants on Choi's claim that he was denied his right under California Penal Code S 851.5 to make a telephone call. Final judgment was then entered for all defendants.
 
 
 26
 Choi appeals.
 
 ANALYSIS
 
 27
 Violation of the Fourth Amendment. We look at the evidence drawing all inferences that may reasonably be drawn in favor of the nonmoving party. We address first the question of whether Choi presented enough evidence to make jury questions of whether he was justifiably stopped for investigatory purposes, Terry v. Ohio, 392 U.S. 1 (1968), and whether he was arrested with probable cause.
 
 
 28
 A Terry stop has recently been authoritatively described by Chief Justice Rehnquist as "a brief, investigatory stop," requiring more than an inchoate suspicion or hunch of criminal activity. Illinois v. Wardlow, 120 S. Ct. 673, 675 (2000). The Anaheim police officers who with drawn weapons ordered Choi to the ground had little to go on. They say that they had been informed by police radio that the suspect was "Oriental," but the police radio log shows that they were informed that the suspect was a particular man noted as Vietnamese and particularly identified not by race or ethnicity but by name: Phu Nguyen. The officers generalized from this information to a classification embracing 2 billion persons. U.S. Bureau of the Census, Report WP/98, World Population Profile (U.S. Government Printing Office, 1999). The officers also knew the height and weight and age of Phu Nguyen, and none of these figures matched Choi's height, weight or age, nor did Choi's clothing match Nguyen's. Except for their rash generalization, the officers had no reason to think Choi was their man, save that he was within 1/5 of a mile from the abandoned CHP vehicle. They argue that next to him was a man they had seen running, but nothing in the police broadcasts had indicated that there were two suspects; if anything, the presence of a man they believed to have run from the vehicle should have focused their attention on the runner as the single suspect. Instead, without basis in fact at all, they were soon telling the CHP that they had seen both men running from the abandoned vehicle.
 
 
 29
 As they were investigating one suspected of a violent crime against a police officer, it was not unreasonable for them to pull their guns and pat down the suspect. But it is difficult to characterize what they did as "investigatory" when they did not ask Choi a single question. And within two minutes or so, according to the Anaheim police report, they had taken Choi into "custody" -a stage apparently marked off by the police as different from a stop and difficult to differentiate from an arrest. United States v. Torres-Sanchez, 83 F.3d 1123, 1127 (9th Cir. 1996); McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984).
 
 
 30
 In summary, there was sufficient evidence to go to the jury on whether theAnaheim police had enough to justify a Terry stop and on whether they had conducted a Terry stop. There was further evidence to go to the jury on whether they had arrested Choi without probable cause. See Van Tran v. Lindsey, 2000 W.L. 622070 (9th Cir. 2000); United States v. Ricardo D., 912 F.2d 337, 342 (9th Cir. 1990).
 
 
 31
 Monell Liability. To establish the liability of the City of Anaheim under Monell v. Dep't of Social Services , 436 U.S. 658 (1978), Choi must satisfy several conditions, among them that the City had a city-sponsored custom created by those who may fairly be said to determine official policy and that the custom amounted to at least deliberate indifference to Choi's constitutional right to be free of arrest without probable cause. The facts force us to consider the question whether Choi has produced evidence probative of a custom of Anaheim police officers to arrest persons based on racial or ethnic stereotypes. Such a custom has been found to exist in various police departments throughout the country, see Illinois v. Wardlow, 120 S. Ct. at 682 (dissent). The critical question is whether it existed in Anaheim.
 
 
 32
 At the factual center of the case is the ease with which a member of a minority in a community may be confused with other persons -not even of the same race or ethnicity -who in the eyes of the majority look like him. Here a Korean in his thirties, short and slim, was confused with a Vietnamese teenager, who was taller and heavier, apparently because to the community majority they looked "Asian" or "Oriental." Only stereotyping of this sort can account for the firm identification of Choi by those who had seen the actual murderer. We cannot hold them accountable for their convention-bound vision. We can, however, expect more of police moving in a community of many ethnicities.
 
 
 33
 The Asian/Pacific Islander population of the state of California in 1996 was 3,938,000, of whom 1,700,000 lived in Los Angeles, Riverside, and Orange Countries. This population in Anaheim itself was approximately 25,000. U.S. Census Bureau, Statistical Abstract of the United States (1999). To treat persons in this grouping as fungible when one of the group is a crime suspect would be to say that the police could arrest at will. A custom of treating "all Asians " alike would be intolerable.
 
 
 34
 The record in this case is an instance where a Korean was taken for a Vietnamese. No other incident of this kind is noted. The record does not establish a city-sponsored custom of such careless stereotyping. An ingredient necessary to establish the City's liability is lacking.
 
 
 
 Notes:
 
 
 [1]
 Publication is pursuant to Ninth Cir. R. 36-2(g).