**UNITED STATES of America,
Plaintiff,**

v.

**Ronald Ray ZURMILLER, Defendant.**

**No. CR 02–13–BU–DWM.**

United States District Court,
D. Montana,
Butte Division.

March 5, 2003.

Kris McLean, AUSA, Missoula, MT, for United States.

Melissa Harrison, Assistant Federal Defender, Missoula, MT, for Defendant.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

Pending before the Court is Defendant's motion to suppress. A hearing was held on February 26, 2003. Following the testimony, I asked the parties to submit supplemental briefs. After considering the original and supplemental briefs, the testimony at the hearing, and the arguments of the parties, I am prepared to rule. In my view, the motion to suppress should be denied.

### II. Factual Background[1]

On October 15, 2002, Deputy Bill Flynn of the Beaverhead County Sheriff's Department received a report from Judy Mohr, a store owner in Wisdom, Montana, that on the previous day, Defendant Ronald Zurmiller had purchased a box of .220 Swift ammunition. Zurmiller told Mohr that he needed ammunition for a "Rugger (sic) Model 77 .220 Swift rifle."[2] Zurmiller told Mohr that he was going to take the rifle to a shooting range to see how it shot. The purchase aroused Mohr's suspicions, as she was aware that a rifle of the same make and model had been stolen from Jared Wise a few days earlier.[3] Mohr passed her suspicions along to Flynn.

The information from Mohr piqued Flynn's interest and made Zurmiller a suspect in the theft of Wise's rifle. Three things about Zurmiller's conduct were suspicious to Flynn. First, at the time of these events, it was hunting season for antelope and a Ruger Model 77 .220 Swift is not commonly used for antelope hunting. Second, the way Zurmiller asked for the ammunition was odd, both in his pronunciation and in that he asked for ammunition for a specific rifle rather than asking for a caliber of ammunition. Finally, Zurmil-

---

1. The facts set forth below were established primarily through the testimony of Deputy Flynn and were either uncontroverted or corroborated by the testimony of other witnesses. I found Flynn to be a very credible witness.

2. Zurmiller pronounced Ruger with a short "u" sound rather than a long "u" sound.

3. On October 12, 2002, Jared Wise had reported to the Beaverhead County Sheriff's Department that a Ruger Model 77 .220 Swift rifle had been stolen from his pickup while he was hunting. Wise described the rifle as having a black BSA deer hunter scope, a brown sling with a deer imprint on it, and "Russell Wells" engraved on the bottom of the barrel inside the stock. The engraving could not be seen unless the stock was removed.

ler's statement that he wanted to see how the gun shot indicated he was unfamiliar with the rifle, likely meaning that he had recently acquired it.

Flynn knew Zurmiller from a previous interaction. In September 2000, he helped evict Zurmiller from a ranch in the area. Around that time, Flynn learned that Zurmiller had felony convictions on his record. On October 12, 2002, Flynn had encountered Zurmiller in a bar and café in Wisdom. A few minutes after Flynn entered the bar/café, Zurmiller exited and left a full drink sitting at the bar. Flynn thought this behavior was odd, so he asked the person who had been sitting next to Zurmiller if he knew what Zurmiller was doing in the area. The person told Flynn that Zurmiller was hunting moose. A check with the Montana Department of Fish, Wildlife and Parks revealed that Zurmiller had not been issued a Montana hunting license.

Flynn had information that Zurmiller was driving an older model silver Chevy truck. On October 12, 2003, he located a silver and red Chevy truck with Nebraska plates at the Nez Perce Motel in Wisdom, though he did not know at that time whether it belonged to Zurmiller. A check on the license plates indicated that they were "not on file." Subsequently, on October 16, 2002, after Flynn knew the truck belonged to Zurmiller, he ran another license plate check. Again, the plates came back as "not on file."

Flynn had previously contacted the owner of the Nez Perce Motel who indicated that Zurmiller had been staying there and that October 15 would be his last night.

The owner also indicated that Zurmiller was in the area antelope hunting.

On October 16, 2002, Flynn began conducting surveillance of Zurmiller in an unmarked vehicle outside the Nez Perce Motel.[4] At 8:30 a.m., he saw Zurmiller take four cans of beer from his truck, place them in a cooler, and take them into his room. Flynn saw Zurmiller drink at least two of the beers. Shortly after 10:00 a.m., Zurmiller left the motel. Flynn then went to the motel and asked for the contents of Zurmiller's garbage and discovered three empty beer cans.

After checking Zurmiller's garbage, Flynn drove downtown where he saw Zurmiller's truck outside a bar/café. Flynn waited until Zurmiller left and then followed him as he drove south on Highway 287 out of town toward Jackson, Montana. The deputy continued to follow at a distance of one to two miles behind Zurmiller. Along the way, Zurmiller stopped for approximately 50 minutes at a gravel pit. While waiting for Zurmiller to continue, Flynn received information from Sheriff Briggs that Zurmiller could be detained if he possessed firearms or ammunition.

At about the same time Zurmiller left the gravel pit, Flynn heard Owen Brown, an investigator with the Brands Enforcement Division of the Montana Department of Livestock, check in from an inspection he had done in the area. Flynn radioed Brown to ask for his assistance in stopping Zurmiller. At this point, Flynn and Zurmiller were in Jackson. While in Jackson, Flynn saw Zurmiller make a u-turn across a double yellow line. He then instructed Brown to stop Zurmiller.[5] Flynn was im-

---

**4.** Flynn had asked Beaverhead County Sheriff William Briggs to check with ATF to determine whether Zurmiller was prohibited for possessing firearms.

**5.** Flynn testified as follows as to his reasons for stopping Zurmiller:

Number one, Zurmiller was a suspect in a theft of a rifle from our county. He was a known felon, possibly in possession of firearms and/or ammunition. I saw Zurmiller drink beer and then drive his vehicle. I saw him make an illegal U-turn in the middle of Jackson. And also, the Nebraska plate on his vehicle, which I ran the same

mediately behind Brown when he turned on his overhead lights to effectuate the stop.

When Zurmiller stopped, both Flynn and Brown approached his pickup. After identifying himself, Flynn asked Zurmiller for his driver's license, registration, and proof of insurance. He also complied with Montana law by telling Zurmiller he was investigating and at the conclusion, Zurmiller would either be free to go or he would be arrested. While Zurmiller was searching for the requested documents, Flynn asked him if he had ever been convicted of any felonies. Zurmiller replied that he had. Flynn then asked him if he had been drinking. Zurmiller responded that he drank one beer earlier in the day. Next, Flynn asked Zurmiller if he had any firearms in the pickup. He was told by Zurmiller that he had a rifle. When Flynn asked to see the rifle, Zurmiller showed him a Savage Model 110 .270 caliber rifle with no bolt from behind the seat of his truck. The deputy then asked Zurmiller if he had any other weapons in the truck, to which Zurmiller said no.

At this point, Zurmiller still had not produced his driver's license. Flynn asked for it again and Zurmiller stated that it was in the box in the back of his pickup. When Zurmiller opened the box, Flynn saw a handgun in a holster lying on top of a saddle blanket in plain view. Flynn became concerned about the situation because Zurmiller had lied about having additional weapons and he was close to the

handgun, which presented a threat to officer safety. At this point, Flynn again asked Zurmiller if there were other guns in the truck. Again, Zurmiller said no. However, when Flynn asked whether he had a Ruger Model 77 .220 Swift, Zurmiller replied, "You mean the shotgun." Zurmiller then indicated that he had a shotgun and a rifle behind the seat of his truck.

Flynn asked Zurmiller if he could get the guns out and was given permission to do so. He found a Model 870 Remington Express 12 gauge shotgun and a Ruger Model 77 .220 Swift in the pickup even though Zurmiller had earlier lied about these guns. Upon inspection of the latter, Flynn determined that it matched the description of the rifle reported stolen by Wise. An NCIC check on the weapons also revealed that the handgun and the Model 110 Savage .270 had been reported stolen.[6] Flynn arrested Zurmiller for being in possession of stolen property, read him his *Miranda* warning, and had Sheriff Briggs transport him to jail.[7]

At the jail, Sheriff Briggs obtained written consent from Zurmiller to search his truck. The search turned up ammunition for a Ruger Model 77 .220 Swift and black powder and lead ball for a black powder gun.

On October 22, 2002, ATF Special Agent John Komora interviewed Zurmiller at the Beaverhead County Jail. Before questioning, Agent Komora advised Zurmiller of his rights. Zurmiller waived his rights and agreed to answer questions. On De-

---

day as the stop, still came back as not on file.
Tr. of Suppression Hearing, at 20:4–10.
Flynn did not relate his reasons for the stop to Brown, but said only that he needed to speak with Zurmiller.

6. The shotgun and the Ruger Model 77 .220 Swift both came back clear. However, Flynn testified that the Ruger would not show up on NCIC because, while Wise had reported it

stolen, he did not have the serial number for the rifle, which is necessary for inputting a stolen firearm in NCIC. Tr. of Suppression Hearing, at 27:10–18.

7. Flynn testified that approximately 25 to 30 minutes passed between the time Zurmiller was stopped and the time he was placed under arrest. Tr. of Suppression Hearing, at 28:13–19.

cember 5, 2002, Agent Komora arrested Zurmiller on federal charges. Agent Komora again informed Zurmiller of his rights. While being transported to Missoula, Zurmiller answered more questions from Agent Komora.

### III. Analysis

Though Zurmiller originally asserted six grounds for suppressing evidence and statements, his post-hearing brief narrowed the scope of his argument to three main issues. First, Zurmiller argues the stop was illegal because (1) Officer Brown did not have a reasonable suspicion that an offense had occurred, and (2) the u-turn Flynn observed was not illegal under Montana law. Next, Zurmiller argues that Flynn did not have probable cause to believe that Zurmiller was driving under the influence of alcohol, was a felon in possession of a firearm or ammunition, or that he had stolen the rifle belonging to Jared Wise. Finally, Zurmiller argues that, even if the stop was legal, evidence still must be suppressed because (1) the questioning and search exceeded the scope of the traffic stop; (2) Zurmiller should have been *Mirandized* after the first gun was discovered; (3) Zurmiller's consent to allow Flynn to take the third and fourth guns out of the truck was not voluntary; and (4) Zurmiller was questioned after requesting an attorney.[8]

### A. Reasonable Suspicion for the Stop

#### 1. The u-turn

█ An officer may perform an investigative stop if he has a reasonable suspicion that a person is involved in criminal activity. *United States v. Colin,* 314 F.3d 439, 442 (9th Cir.2002). Reasonable suspicion exists when there are "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (internal quotation marks and citations omitted). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and be capable of rational explanation." *United States v. Lopez–Soto,* 205 F.3d 1101, 1105 (9th Cir.2000) (internal quotation marks and citations omitted).

Zurmiller argues the stop was unlawful because a u-turn is not illegal under Montana law. To the extent Flynn believed a u-turn was illegal, Zurmiller avers that this was a mistake of law and cannot amount to reasonable suspicion.

Zurmiller's argument attempts to isolate one of the five reasons Flynn gave for stopping Zurmiller. In his testimony, Flynn stated that he had five reasons for stopping Zurmiller:

> Number one, Zurmiller was a suspect in a theft of a rifle from our county. He was a known felon, possibly in possession of firearms and/or ammunition. I saw Zurmiller drink beer and then drive his vehicle. I saw him make an illegal U-turn in the middle of Jackson. And also, the Nebraska plate on his vehicle,

---

**8.** Zurmiller originally argued that the traffic stop was unreasonably long and that Special Agent Komora's questioning regarding possible federal charges was done after he requested an attorney. On the former issue, Zurmiller argued that the traffic stop lasted nearly three hours. At the hearing, Flynn testified that the stop lasted about 30 minutes. This testimony was corroborated by Brown. Zur-

miller does not mention the length of the stop in his supplemental brief and I presume he has withdrawn this argument. To the extent the issue is still outstanding, I find that the stop lasted approximately 30 minutes and that it was not unreasonably long. On the latter issue, counsel for Zurmiller conceded at oral argument that Agent Komora's questioning of Zurmiller was not illegal.

which I ran the same day as the stop, still came back as not on file.

Tr. of Suppression Hearing, at 20:4–10. While Zurmiller may be correct that a u-turn is not illegal under Montana law, this is irrelevant unless none of the other asserted reasons for the stop amounted to a reasonable suspicion to believe Zurmiller was engaged in criminal activity. That is not the case, as Flynn was justified in making the stop based on (1) a reasonable belief that Zurmiller was involved in the theft of Wise's rifle; (2) a reasonable belief that Zurmiller was a felon in possession of a firearm and ammunition; and (3) the license plates coming back "not on file;". Each of these reasons gave Flynn a valid basis for making the stop, as each was based on specific articulable facts that led him to believe Zurmiller was involved in criminal conduct.[9]

Despite Zurmiller's attempts to narrow the basis for the stop, the fact remains that Flynn asserted five reasons for stopping Zurmiller, a position which he maintained throughout the hearing. The u-turn was not the sole reason for the stop, but was the catalyst that brought the stop to a head.

This case presents a different question from that in *Lopez–Soto.* In that case, the Ninth Circuit determined that the officer's reason for stopping the defendant was unreasonable because the officer was mistaken about the law. The officer had been trained that Baja California required a vehicle to have a registration sticker that was visible from the rear of the vehicle. The officer stopped Lopez–Soto after he noticed that there was not a registration sticker on the rear of the vehicle. The officer eventually discovered a large amount of marijuana in Lopez–Soto's vehicle. 205 F.3d at 1103. The Ninth Circuit held that defendant's suppression motion should have been granted because Baja California law actually required that a registration sticker be affixed to the upper right corner of the windshield. *Id.* at 1105. The stop was unreasonable because it was unsupported by law, even though the officer was acting in good faith.

The sole reason for the stop in Lopez–Soto was the defendant's supposed violation of Baja California's registration sticker placement law. Here, conversely, Flynn had additional reasons beyond the u-turn for stopping Zurmiller. These additional reasons cannot be isolated or disregarded simply because the last thing to occur before the stop was the u-turn. Thus, even if the u-turn was not illegal, Officer Flynn had reasonable suspicion to make the stop based on other grounds.

**2. Other grounds for the stop**

█ Disregarding the u-turn, Flynn had three valid reasons for stopping Zurmiller.[10] First, two separate checks on Zurmiller's license plates on different days indicated that the plates were "not on file." This alone gave Flynn a reasonable basis to stop Zurmiller to determine why his plates were not on file. *See United States v. Rojas–Millan,* 234 F.3d 464, 469 (9th Cir.2000)(two checks on a license plate number that came back "no match" gave

---

**9.** Because I determine that Flynn had valid reasons other than the u-turn for stopping Zurmiller, it is not necessary to determine whether Zurmiller's u-turn was illegal under Mont.Code Ann. § 61–8–328 or § 61–8–334.

**10.** I find that Flynn did not have a reasonable basis to stop Zurmiller to investigate whether he was driving under the influence. Though

Flynn had a reasonable basis to believe that Zurmiller had consumed four beers, he did not testify that he witnessed any erratic driving, slurred speech, or anything else that would indicate Zurmiller was under the influence of alcohol. However, in light of my other determinations, the lack of a basis to believe Zurmiller was driving under the influence does not affect the legality of the stop.

officer a reasonable basis to conduct a traffic stop to determine whether the plates were fictitious).

■ Second, Flynn had a reasonable basis to believe that Zurmiller was a felon in possession of firearms and ammunition. Flynn knew from previous contact that Zurmiller had been convicted of a felony and he verified that information before making the stop. Likewise, Flynn knew that Zurmiller had purchased ammunition for a Ruger Model 77 .220 Swift and that Zurmiller had said he wanted to see how the gun shot. These are specific articulable facts upon which Flynn could reasonably conclude that Zurmiller was a felon in possession of a firearm and ammunition and justified further investigation.

Additionally, Flynn attempted to confirm with ATF that the felony conviction deprived Zurmiller of his right to possess firearms and ammunition. At the time Zurmiller was stopped, ATF had not made this determination. However, the law does not require that Flynn was certain that Zurmiller was committing an offense. Rather, to continue his investigation he needed only to have a reasonable suspicion that an offense had been committed. That Flynn knew Zurmiller was a convicted felon and knew he had purchased ammunition supplied the foundation that enabled him to continue his investigation.[11]

■ Finally, Flynn had a reasonable basis to believe that Zurmiller was involved in the theft of Wise's rifle. Flynn had received a report that Zurmiller had purchased ammunition for a "Rugger (sic) Model 77 .220 Swift." This information allowed Flynn to draw several inferences that were supported by objective facts. First, Flynn was able to deduce that Zurmiller had a Ruger Model 77 .220 Swift rifle. This is supported by the fact that Zurmiller asked Mohr for ammunition for a "Rugger (sic) Model 77 .220 Swift" rather than asking for the ammunition by caliber.

Second, Flynn was able to infer that Zurmiller had recently obtained the rifle. This inference is supported by the fact that Zurmiller pronounced Ruger incorrectly, was using a rifle not commonly used *at that time of year in that area,* and that he said he wanted to see how the rifle shot. These inferences, coupled with the fact that Zurmiller had recently appeared in the Wisdom area and that the type of rifle Zurmiller apparently had was recently reported stolen, gave Flynn a reasonable basis to continue his investigation by stopping Zurmiller to ask questions to confirm or dispel his suspicions.

Though any of these facts taken alone appear innocent, when taken as a whole, they create a reasonable suspicion that Zurmiller was involved in the theft of Wise's rifle. *The proper inquiry is not to parse out facts and consider them separately.* Rather, in determining whether reasonable suspicion exists, I must look to the totality of the circumstances. In this case, considering the facts known to Flynn, it was reasonable for him to believe that Zurmiller had recently acquired a Ruger Model 77 .220 Swift rifle, it was reasonable

---

**11.** Zurmiller argues that because it ultimately turned out that his felony convictions do not count under 18 U.S.C. § 922, Flynn's belief that Zurmiller was a felon in possession of a firearm was a mistake of law similar to that in *Lopez–Soto.* However, this mistake is more appropriately considered a mistake of fact. A mistake of fact can still amount to a reasonable basis for a stop so long as the mistake is not unreasonable. In this case, Flynn's mistaken belief that Zurmiller's felony conviction precluded him from possessing firearms or ammunition is more akin to a situation where a stop is based on misidentification of a suspect. *See United States v. Lang,* 81 F.3d 955, 966 (10th Cir.1996)(cited with approval in *Lopez–Soto,* 205 F.3d at 1106).

for him to conclude Zurmiller had stolen that rifle from Wise, and, therefore, it was reasonable for him to stop Zurmiller to continue his investigation. At its essence, Flynn did what police are supposed to do: act on reason and common sense to perform good police investigative work.

### 3. Brown's authority to make the stop

■ Zurmiller also argues that the stop was illegal because Brown did not witness any wrongdoing and therefore did not have a reasonable suspicion to make an investigatory stop. However, Zurmiller does not point to any case law to support such a hyper-technical interpretation of the reasonable suspicion requirement. Brown was not stopping Zurmiller to perform an investigation. Rather, he was simply acting as a conduit through which Flynn was making the stop. Both officers testified it was Flynn who wanted to make the stop and it was Flynn who was in control throughout the stop. Because Flynn was in his personal vehicle and did not have emergency lights, however, he did not have a ready means for effectuating the stop. There is no basis in law for finding that an officer must give a full explanation for the reasons for wanting to make a stop before enlisting the assistance of another officer.

### B. Should evidence be suppressed even though the stop was legal

### 1. Questioning did not exceed the scope of stop

Zurmiller argues that Flynn's questioning exceeded the scope of the stop because, after asking for his license, registration and proof of insurance, Flynn immediately asked whether Zurmiller was a felon and whether he had any guns. As noted earlier, the traffic offenses were not the sole reasons for the stop. Flynn had a reasonable suspicion to believe that Zurmiller was a felon in possession of a firearm and ammunition and that he had stolen Wise's rifle. Because Flynn's questions were related to these suspicions, they did not exceed the scope of the stop.

### 2. *Miranda* warnings were not necessary after the first gun was found

■ Zurmiller asserts that Flynn told him he was not free to leave and, therefore, he should have been given *Miranda* warnings before being asked if he was a convicted felon or if he had any guns in the truck. The United States counters that Zurmiller was not under arrest and so was not entitled to *Miranda* warnings.

■ A person detained during a routine traffic stop is not in custody for purposes of *Miranda* absent some action by the police that results in the curtailment of a person's freedom to the "degree associated with a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (citation omitted). A routine traffic stop is more akin to a Terry stop in which an officer who has a reasonable suspicion to believe that a person has committed, is committing, or is about to commit an offense may temporarily detain the person and ask "a moderate number of questions to determine the person's identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439, 104 S.Ct. 3138. If the officer's questions do not provide probable cause for an arrest, the person must be released. *Id.* at 439–40, 104 S.Ct. 3138.

The situation envisioned by the Supreme Court in *Berkemer* and in *Terry v. Ohio* is what occurred here. Flynn had reason to believe Zurmiller was a felon in possession of firearms and ammunition and was in possession of a stolen firearm. After pulling Zurmiller over, Flynn asked a few

questions, including whether Zurmiller had any guns. Zurmiller produced one gun in response to the questioning. While Zurmiller was looking for his license, Flynn saw another gun. Then, despite saying he had no other guns, Zurmiller produced two more after further questioning. As this sequence of events proceeded, Flynn had cause to grow more suspicious and to ask additional questions to dispel those suspicions. Eventually, however, Flynn's suspicion that Zurmiller was involved in the theft of Wise's rifle was confirmed when Zurmiller produced a gun matching the description of the one reported stolen by Wise. Additionally, a routine check through NCIC revealed two other guns were stolen, as well. At that point, Zurmiller was arrested.

There is nothing in the record that indicates Zurmiller was detained "to a degree associated with a formal arrest." Flynn's questioning was brief, related to the purposes for the stop, and occurred along the roadside in public view. Likewise, much of the questioning occurred while Zurmiller was searching for his driver's license. This was not the type detention in which *Miranda* warnings are required and Zurmiller's argument that *United States v. Chan–Jimenez* applies is misplaced. *See* 125 F.3d 1324 (9th Cir.1997) (finding that an officer's retaining identification papers longer than necessary can result in an unlawful seizure rendering consent to search involuntary).

### 3. Whether consent to search was voluntary

Zurmiller argues that the search of his truck was illegal because his consent was involuntary. Again, Zurmiller maintains that he should have been Mirandized before being asked about the guns. The United States argues that the search of the truck on the roadside was voluntary when considering the totality of the circumstances.

▮ Whether consent is voluntarily given is a fact question based on the totality of circumstances. *United States v. Torres–Sanchez,* 83 F.3d 1123, 1129–30 (9th Cir.1996). In determining voluntariness, the Ninth Circuit has established various factors to consider, including:

(1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether Miranda warnings had been given; (4) whether the defendant was told he has a right not to consent; and (5) whether the defendant was told a search warrant could be obtained.

*Id.* at 1129. Not all factors need be established for consent to be voluntary. *Id.* at 1130.

In *Torres–Sanchez,* the Ninth Circuit found the defendant's consent was voluntary even though the officer did not give Miranda warnings, did not tell the defendant he had a right to refuse, and did not tell him that a warrant could be obtained. *Id.* Especially relevant was that the defendant was not under arrest. *Id.*

▮ Here, Flynn retrieved two rifles from Zurmiller's truck after receiving permission to do so. Given the totality of circumstances, Zurmiller's consent was voluntary. Similar to the defendant in *Torres–Sanchez,* Zurmiller was not given his *Miranda* rights, was not told he did not have to consent, and was told a search warrant could be obtained. However, Zurmiller was not in custody, nor was the environment surrounding the search coercive. Zurmiller was not free to leave, but he was not in custody, either. Rather, he was being temporarily detained while Flynn investigated his suspicions. The level of detention was no different than that associated with any other traffic or *Terry* stop.

### 4. Zurmiller was not illegally questioned after requesting an attorney

Finally, Zurmiller argues that during his initial questioning he requested an attorney and that answers given during all subsequent questioning must be suppressed. Zurmiller claims that he could not waive his right to have counsel during questioning without counsel being present. The United States argues that Zurmiller was given *Miranda* warnings each time before questioning and that he waived his right to have counsel present.

Once a suspect has invoked his right to counsel, questioning by police cannot resume unless counsel is present. *Minnick v. Mississippi*, 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489. A suspect who has invoked his right to counsel may waive his Fifth Amendment protections if he initiates conversations or discussions with the authorities. *Id.* at 156, 111 S.Ct. 486.[12]

Here, Sheriff Briggs testified that Zurmiller was Mirandized and asked whether he wanted an attorney present. Zurmiller consented to a search of his truck and to answer questions without counsel present. Tr. of Suppression Hearing, at 70:14–16. Zurmiller's argument is based on a notation in the report of a detective from Wyoming which indicates Zurmiller invoked his right to counsel. However, this information is not reliable. While Flynn testified that Zurmiller had requested an attorney before questioning, he was not present when the truck was searched. Sheriff Briggs testified that Zurmiller waived his right to counsel. There are no facts in the record to indicate otherwise.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Suppress (dkt# ) is DENIED.

12. Zurmiller overstates the holding of *Minnick* when he states that "once a defendant has asked for counsel, he cannot waive his rights without counsel being present." As the opinion in *Minnick* makes clear, a suspect can waive his Fifth Amendment rights, even after invoking his right to counsel, simply be reinitiating discussions with the police.