[No. C031844. Third Dist. June 1, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LAWRENCE RUSSELL et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II of the DISCUSSION.

COUNSEL

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Robert Lawrence Russell.

Barry L. Morris, under appointment by the Court of Appeal, for Defendant and Appellant Louis Burks, Jr.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMS, Acting P. J.**—After their motion to suppress evidence (Pen. Code, § 1538.5) was denied, defendants Robert Lawrence Russell and Louis Burks, Jr., pursuant to a plea bargain, pleaded guilty to transportation of cocaine (Health & Saf. Code, § 11352, subd. (a); undesignated statutory references are to the Health and Safety Code). They were sentenced to prison and now appeal, contending the trial court erred in denying the suppression motion. We reject the contention and shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 1998, an information was filed charging defendants with (1) possession and use of a false compartment to transport a controlled substance (§ 11366.8); (2) possession of cocaine for sale (§ 11351); (3) transportation of cocaine (§ 11352, subd. (a)); (4) transportation of cocaine between noncontiguous counties (§ 11352, subd. (b)); (5) carrying of concealed weapon by Burks (Pen. Code, § 12025, subd. (a)(1)); and (6) possession of cocaine while armed with a firearm (§ 11370.1). It was also alleged the amount of cocaine exceeded four kilos (§ 11370.4, subd. (a)) and that Burks had two prior narcotics convictions (§ 11370.2, subd. (a)) and had served two prior prison terms (Pen. Code, § 667.5, subd. (b)).

Burks moved to suppress evidence found in the car, arguing among other things that Russell's consent to search the car was invalid because it was improperly obtained as a result of an unreasonably prolonged detention. (Pen. Code, § 1538.5.) Russell joined in the motion and moved to suppress his statements, adding a cursory argument that his consent to the search was invalid because it was the result of coercion, in that Russell was subjected to

questioning unrelated to the traffic stop while Burks was detained in the backseat of the patrol car.

The following evidence was adduced at the hearing on the suppression motion:

About 7:00 a.m. on February 28, 1998, California Highway Patrol Officer Joseph Lapthorne was patrolling Interstate 5 in Shasta County when he observed a black Ford Taurus traveling northbound at a speed of 53 to 58 miles per hour in an area where the speed limit was 65 miles per hour. The Taurus repeatedly drifted around within its lane and sometimes out of its lane.[1] The officer followed for about three miles, during which he ran a check on the license plate, which apparently did not reveal any problems. He then initiated a traffic stop.

Officer Lapthorne had been an officer for 15 years and had received extensive training in drug interdiction. As the officer approached the car, he smelled an "overwhelmingly strong" odor, and in his experience such masking odors were used to mask the odor of drugs.

The driver of the vehicle, Burks, immediately volunteered, without being asked, that the odor was from a Vicks tablet he was taking for a cold. Though there was a package of Vicks in the car, in the officer's opinion the odor he smelled was not Vicks. When asked for identification, Burks produced a California driver's license bearing the name Larry Johnson. Burks said he could not produce the vehicle registration because the car did not belong to him. Defendant Russell then said the car belonged to his niece.

Although nothing in Burks's manner or speech suggested intoxication, the officer observed Burks's eyes were red and watery, suggesting he had been drinking or was sleepy. The officer also made observations which in their totality suggested drug activity, including: the overwhelming odor (frequently used to mask drugs); the driver's unsolicited claim that the odor was a Vicks tablet (suggesting possible drug paranoia); the registered owner of the car was not present (a ploy used by drug traffickers to try to create confusion as to who is responsible for drugs found in the car); one of the occupants was wearing a pager, and there was a cellular phone in the car; there were worn screws on the dashboard and the upholstery did not appear

---

[1]Burks, in his statement of facts, says the officer conceded it is common for driving to become erratic when drivers notice a patrol car is following them. However, what the officer said was that it is common for drivers to exhibit a momentary deviation as they become aware of the officer's presence, but then the driving will straighten out. In the officer's experience, continued erratic driving denotes an intoxicated or sleepy driver, or one who remains nervous because of involvement in criminal activity.

to be the original, suggesting the vehicle may have been disassembled; and the occupants were two men, from Los Angeles, where large quantities of drugs are brought into the country, and were headed north, apparently having driven through the night.[2]

The officer had Burks get out of the car and walk back to the patrol car, in order to investigate the possibility he was not fit to be driving or was involved in drug trafficking activity. No field sobriety test was performed. The officer concluded Burks's red eyes and slow gait were attributable to a cold.

Burks was nervous and hesitant in giving answers. He said he and his passenger were brothers and were on their way to a weekend vacation in Portland, where they were not planning on visiting anyone. The officer knew Portland to be a major distribution area for illegal drugs. Burks said he was cold and sick, so the officer asked if he wanted to sit in the patrol car. Burks sat in the backseat of the patrol car, and the officer closed the door (which could not be opened from the inside). Burks was not handcuffed or placed under arrest, but the officer testified Burks was not free to leave.

The officer then spoke with the passenger, Russell, who said he was Burks's brother and who produced a California driver's license in the name of Robert Bangston. Russell said he and Burks were going to visit Russell's niece in Portland (contrary to Burks's assertion they were not going to see friends or family in Portland), but Russell could not provide an address or phone number for his niece in Portland. Russell first said he and Burks lived in Los Angeles, then said they lived in Portland and Los Angeles. When asked how they came into possession of the car, Russell initially said his niece had delivered it to him in Los Angeles. He later said Burks and his niece had driven the car to Los Angeles, and the niece had flown back to Portland. Russell said he was responsible for the car and its contents. The entire conversation with Russell lasted approximately three to five minutes, during which Russell was nervous and evasive. The officer had a strong suspicion of drug activity and did not consider Russell free to leave.

The officer asked Russell for consent to search the vehicle, and Russell gave consent. The officer had Russell sit in the back of the patrol car with Burks. Russell was not handcuffed or placed under arrest, but was not free to

---

[2]Defendants suggest the officer had no reason to think they had driven through the night rather than spent the night in a motel along the way. The officer testified that when the Taurus pulled over, the passenger bolted upright, having apparently been asleep. The trial court struck the officer's conclusion that the passenger had apparently been sleeping. In any event, the driver's unsteady driving and red eyes were at that point possible indicators of overnight travel.

leave. As Russell entered the patrol car, Burks became upset and asked why he had been stopped and why the car was being searched.

The officer searched the car and found a locked non-factory-manufactured compartment between the rear seat and trunk wall. Defendants were placed under arrest for violation of section 11366.8, possession of a false compartment designed for storing controlled substances in a vehicle. The arrest occurred about 7:25 a.m., approximately 25 minutes after the officer's first verbal contact with defendants.

The locked compartment was later broken open with a crowbar, and revealed guns, two large bricks of cocaine, numerous wax-type Glade air fresheners, and a towel smeared with wax air freshener.

The defense presented expert testimony of a former police officer, who examined the Taurus and said the dashboard screw was not worn, but it did bear discernible tool marks. He testified he saw nothing indicating the upholstery was not factory installed. However, he also said he was not familiar with Ford Tauruses.

The trial court also had before it the preliminary hearing testimony of an officer who examined the Taurus and saw nothing unusual about the upholstery.

The trial court denied defendants' suppression motion.

Defendants then pleaded guilty to count 3—transportation of a controlled substance—and the other charges were dismissed. Russell received a three-year sentence. Burks, who also admitted the prior narcotics convictions and one of the prior prison terms, was sentenced to a total of 10 years, comprised of a three-year midterm on count 3, consecutive three-year terms for the prior convictions and a consecutive one-year term for the prior prison term.

DISCUSSION

I. *No Unreasonably Prolonged Detention*

■ Defendants argue the consent to search the car was invalid because it was the product of an unreasonably prolonged detention. We disagree.

■ An investigatory stop exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible. (*People v. McGaughran* (1979) 25 Cal.3d 577, 586

[159 Cal.Rptr. 191, 601 P.2d 207].) Circumstances which develop during a detention may provide reasonable suspicion to prolong the detention. (*People v. Warren* (1984) 152 Cal.App.3d 991, 995-997 [199 Cal.Rptr. 864].) There is no set time limit for a permissible investigative stop; the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly. (*United States v. Sharpe* (1985) 470 U.S. 675, 686-688 [105 S.Ct. 1568, 1575-1576, 84 L.Ed.2d 605, 615-617]; *People v. Soun* (1995) 34 Cal.App.4th 1499, 1520 [40 Cal.Rptr.2d 822].)

■ On review of denial of a suppression motion, we defer to the trial court's factual findings where supported by substantial evidence, but exercise independent judgment to determine whether, on the facts found, the search was reasonable under Fourth Amendment standards. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Brown* (1998) 62 Cal.App.4th 493, 496 [72 Cal.Rptr.2d 793].)

■ Here, defendants suggest there was no reason to stop them, because there was no contention that the erratic driving constituted a traffic violation. However, the erratic driving justified the stop to determine whether the driver was intoxicated.

Defendants argue that any concern the driver was drunk or sleepy was immediately dispelled when the officer spoke to Burks, who spoke coherently and produced his driver's license without difficulty; hence the detention should have ended at that point. However, defendants ignore the evidence that the officer still had reason to question the driver's fitness to drive, because the driver's eyes were red and watery. Although the driver said he had a cold, the officer was not required to accept that statement without further inquiry.

Although the officer concluded the red eyes were attributable to a cold after watching the driver walk back to the patrol car, by that time the officer had received further information giving cause for suspicion concerning drug activity. (*People v. Warren, supra,* 152 Cal.App.3d at pp. 995-997 [facts which come to light during detention may provide reasonable suspicion to prolong detention]; *People v. Suennen* (1980) 114 Cal.App.3d 192, 200-201 [170 Cal.Rptr. 677] [if additional cause to detain develops after initial stop, additional time to investigate is allowed].)

Thus, when the officer first approached the car, he noticed an overwhelming masking odor. Although the driver asserted the odor came from a Vicks tablet, the officer testified he noticed the odor as he approached the bumper

of the vehicle from behind, the odor was overwhelming, and in the officer's opinion the odor was not Vicks.

Defendants argue many innocent people use air fresheners. However, here the odor was overwhelming from outside the vehicle. Contrary to defendants' position, the odor, together with the other circumstances (e.g., absence of car owner, presence of pager and cell phone, dashboard screw indicating possible removal, etc.) justified investigation of possible drug activity before the officer concluded Burks was fit to drive. On top of all the other circumstances, Burks's nervousness and hesitancy in answering questions gave further basis for suspicion, justifying the questioning of Russell, whose evasiveness and inconsistent answers gave even more grounds for suspicion.

That the officer admitted he investigated the possibility of drug trafficking with every traffic stop does not assist defendants. That could merely mean the officer kept alert for signs of possible drug activity. In any event, the overwhelming masking odor, together with the other circumstances, justified the drug inquiry in this case.

Defendants note the officer first said he was not familiar with Operation Pipeline (drug-related arrests on the roadways), then after a recess said he had misunderstood the question and was familiar with it. Contrary to defendants, we do not see this matter as destroying the officer's credibility. Defendants also believe they destroyed the officer's credibility by showing there was nothing unusual about the screws or upholstery. However, the defense's own witness said the dashboard screw, though not worn as the officer indicated, bore tool marks. That another officer saw nothing unusual about the upholstery does not destroy the credibility of the arresting officer.

Defendants argue the officer had no justification for inviting Burks to sit in the patrol car. However, the justification was that Burks said he was cold and sick.

Defendants argue the detention was unreasonably prolonged because the officer had no reason to be concerned about the car being stolen, in that he had already done a vehicle check before stopping them. However, though the car had not been reported stolen, there were still grounds for suspicion, because defendants claimed to have borrowed the car from someone whose address or phone number they did not know, for a long trip to Portland where, according to one defendant, they were going to visit the car owner (despite not knowing her address), and according to the other defendant, they were not going to visit anyone.

Defendants argue the officer did not even have grounds to detain them, because the drug profiling indicators were so broad as to include many

innocent travelers. They cite *U.S. v. Hernandez-Alvarado* (9th Cir. 1989) 891 F.2d 1414, which held police officers did not have reasonable suspicion of criminal activity to justify an investigatory stop of a vehicle. There, border patrol agents driving in the vicinity of the Mexican border pulled alongside a car with a large trunk capacity (capable of carrying contraband) and an antenna protruding from the trunk (frequently used by drug smugglers). (*Id.* at p. 1415.) The driver saw the agents, quickly turned his attention back to the road, reduced his speed from 65 miles per hour (the posted limit) to 55 miles per hour, drove very cautiously, and sat rigidly, as did the woman and child who accompanied him. The car's license plate frame displayed the name of an automobile dealership notorious for narcotics activity, though the officers believed law-abiding citizens also bought vehicles there. (*Ibid.*) A check of the vehicle indicated the owner lived in a neighborhood under investigation for narcotics activity. Based on these factors, the officers made a traffic stop. (*Id.* at p. 1416.) The Ninth Circuit concluded it was a close case, but the total circumstances did not justify an investigatory stop, because the indicators described too many persons. (*Id.* at p. 1419.)

Here, in contrast, the driver was drifting around in his lane. This justified the stop. The overwhelming odor, together with the other circumstances, justified investigation regarding possible drug activity. Thus, this case is distinguishable from *Hernandez-Alvarado*.

This case is more similar, though not identical, to *U.S. v. Torres-Sanchez* (9th Cir. 1996) 83 F.3d 1123, which upheld a consensual search of a vehicle following a 20-minute "detention." There, officers stopped a pickup truck in Nevada for speeding, lack of license plates, and illegally tinted windows. The driver was very nervous. The occupants, who said they were going to Twin Falls, Idaho, could not produce a vehicle registration. They first said the truck belonged to the sister-in-law of one of the occupants. (*Id.* at p. 1125.) After the officer ran a check on the driver's license and returned to the truck, the occupants indicated the truck belonged to the sister-in-law of a different passenger, though the officer acknowledged this seeming inconsistency may have been attributable to a language barrier. (*Ibid.*) The officer noticed a strong smell of cologne in the car. He was suspicious the car might be stolen or involved in transporting drugs. The officer told the occupants he was not going to issue a traffic citation. He asked the passenger who most recently claimed kinship with the car owner to step back to the patrol car, then invited him to sit inside due to the cold weather, and questioned him. This passenger (Sanchez) said they were on their way to visit his aunt in Idaho, yet he did not know her address. (*Ibid.*) The officer returned to the pickup with further questions. He asked the other passenger (who had previously claimed kinship with the owner) for consent to search, and she

said she had no objection, it was not her vehicle. The officer returned to the patrol car and asked the other passenger for consent to search. He gave consent. The search revealed illegal drugs. (*Id.* at p. 1126.)

The Ninth Circuit affirmed denial of the defense suppression motion in *Torres-Sanchez*. The appellate court rejected Sanchez's arguments that the officer's questions exceeded the scope of the detention, and the detention was unreasonably prolonged. (*U.S. v. Torres-Sanchez, supra,* 83 F.3d at pp. 1127-1128.) The officer had a reasonable suspicion the vehicle might be stolen (though it had not been reported as such). Although Sanchez was in the patrol car for 20 minutes, he was never required to sit there, rather he sat there because of the cold weather. *Torres-Sanchez* indicated the defendant was free to leave after the officer made routine questions to determine if criminal activity was afoot (but it is unclear when Sanchez would have been free to leave). (*Id.* at p. 1128.) The appellate court said that in attempting to confirm or dispel his suspicions of illegal activity, the officer used no threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics. (*Ibid.*) The court concluded the consent was voluntary. (*Id.* at p. 1130.)

Defendants argue *Torres-Sanchez* is distinguishable because there the stop was justified by traffic violations (speeding, absence of license plate, and tinted windows). However, in the case before us, the stop was justified by erratic driving, giving reason to suspect the driver may be unfit to operate the car. Moreover, *Torres-Sanchez* supports the principle that an officer can continue to detain a person during an investigatory stop when the officer's suspicions are heightened by the investigation (as they were in the case before us). (*U.S. v. Torres-Sanchez, supra,* 83 F.3d at p. 1128.)

Russell argues affirmance in this case will not bode well for "persons of color," because defendants are African-American. However, he fails to develop this point into a cognizable assignment of error, nor does Burks, who merely mentions it in his statement of facts. At the hearing on the motion to suppress, there was some questioning on race and ethnicity, during which the officer said he did not stop defendants because of their race, and he gave confusing testimony that the percentage of African-American arrests had probably increased since November 1997 but decreased since 1984, but he was unable to give percentages of arrests of African-Americans. The officer at one point asserted a privilege when asked about African-Americans, then said two men traveling alone may constitute a possible drug indicator regardless of race, but Hispanics were considered to be in primary control of the drug market. The trial court ultimately cut off this line of questioning on Evidence Code section 352 grounds. Defendants do not

challenge that ruling on appeal and do not develop any argument for reversal on this matter. We therefore have no need to consider it further.

In support of his argument that the rights of innocent citizens are being trampled, Burks in his reply brief claims that only 3 to 5 percent of travelers stopped by law enforcement officers are arrested. However, Burks omits to mention that his cited authority expressly referred to "airport stop cases." (*U.S. v. McKines* (8th Cir. 1991) 933 F.2d 1412, 1432, referring to airport stop cases and citing *United States v. Moya* (N.D.Ill. 1981) 561 F.Supp. 1, 4 [airport suspects].) Burks cites nothing concerning traffic stops of motor vehicles on the public roads.

Also in his reply brief, Burks cites federal cases for the proposition that individually innocent factors cannot be combined to form a suspicious conglomeration unless there are concrete reasons for such an interpretation. Assuming the validity of such a principle, in this case there was a concrete reason—the overwhelming masking odor discernible from outside the vehicle.

We conclude there was no unreasonably prolonged detention in this case.

II. *No Submission to Authority**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Callahan, J., concurred.

**RAYE, J.**—I concur in the result. The scope of appellate review of factual findings is exceedingly narrow. I agree there is substantial evidence to support the trial court's findings in this case. The initial traffic stop was justified by the officer's observation of erratic driving; that the driving did not result in a traffic citation is of no moment. However, the length of the ensuing detention raises difficult factual issues. Nevertheless, I agree the detention was properly prolonged to evaluate the driver's fitness and to make further inquiry into possible drug trafficking. The officer could reasonably suspect drug activity based on two critical facts: the heavy masking odor and the contradictory statements of the vehicle occupants. The officer's additional investigative steps were reasonable and the consent to search, secured during the course of the inquiry, was valid.

*See footnote, *ante*, page 96.

While other facts discussed in the opinion are not without significance, their persuasive force would be limited in the absence of these critical facts. Thus, viewed in isolation, I would draw no criminal inferences from the fact two males, of any particular ethnicity, were traveling late at night from Los Angeles to Portland while equipped with pagers and cell phones. Whatever Portland's reputation, and no matter the diabolical schemes facilitated with cell phones, the universe of people traveling the interstate who use pagers and cell phones includes far too many innocent citizens (salespeople, lawyers and judges included) for possession of such equipment to serve as the basis for an investigative detention.

Defendants suspect the initial stop and prolonged detention were motivated by racial factors and bemoan the "trend away from focusing on the subjective state of mind of an officer in determining whether a detention is valid." However, the "trend" that distresses defendant originates with the United States Supreme Court (see *Whren v. United States* (1996) 517 U.S. 806 [116 S.Ct. 1769, 135 L.Ed.2d 89]) and is one that we are powerless to halt even if we were so inclined. Assuming a proper evidentiary foundation, defendant might assert a claim under the equal protection clause. (*Id.* at pp. 818-819 [116 S.Ct. at p. 1777].) However, defendant offers little evidence to support his suspicion of racial *animus.* Constitutional claims cannot be premised on suspicions, even if the suspicions resonate with a sympathetic jurist. Defendant would be compelled to provide either direct evidence of a policy or practice to target members of certain groups, or statistical data from which such a policy or practice could be inferred. He offers neither. In the presence of solid evidence permitting a finding in support of the officer's expressed reasons for stopping defendant's vehicle, we are compelled to affirm the trial court.

Appellants' petition for review by the Supreme Court was denied September 13, 2000.