Filed 7/16/13  In re Robert D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ROBERT D., a Person Coming Under the Juvenile Court Law. | |
| | D062373 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J221354) |
| v. | |
| ROBERT D., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joe O. Littlejohn and Browder A. Willis, III, Judges.  Affirmed.

Cynthia Han, under appointment by the Court of Appeal; Appellate Defenders, Inc. and Patrick DuNah for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Eric C. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

Robert D. was accused by a petition filed in the juvenile court of possessing a butterfly knife, alleged as a misdemeanor. (Pen. Code, §§ 21310 & 17, subd. (b)(4).) Following the denial of his motion to suppress evidence on Fourth Amendment grounds, Robert admitted the allegations in the petition. He was declared a ward of the juvenile court and placed with his mother.

Robert appeals contending the trial court erred in denying his motion to suppress evidence. We will find his detention and arrest to be proper and affirm.

STATEMENT OF FACTS

The events in this case took place at about 1:30 a.m. on April 4, 2012, on North Twin Oaks Valley Road in San Marcos. At that time Sergeant Michael Blumenthal of the San Diego County Sheriff's Office was driving southbound when he noticed a car parked off to the side of the road with its parking lights on and the engine idling. Aware that there had been a number of residential burglaries in the area, Blumenthal slowed to observe the parked car. As he passed the car, Blumenthal observed Robert raise his head, look at the patrol car and then duck back down.

Blumenthal was able to turn around and again approached the parked car from the back. As he approached the car, Blumenthal turned on his spotlight. Robert again raised his head up, looked at the patrol car and ducked back down out of view. Blumenthal called for backup and noticed that the driver's seat of the car was unoccupied.

As he approached the parked car, Blumenthal observed a scarf draped over the steering column. Such observation was consistent with stolen cars where the driver wants to cover a damaged steering column.

2

When he approached the car the officer observed Robert. He was wearing baggy shorts, an oversized white tee shirt and white socks that covered the portions of his legs that would have otherwise been visible. Robert told Blumenthal that his sister owned the car and that she was "up at the house." Blumenthal believed that Robert's manner of dress was consistent with what he had seen on gang members and persons who had spent time in custody.

The officer feared that Robert might be armed. He told Robert to turn off the engine. He then handcuffed Robert and took him to the back of the patrol car. By then the backup officer, Deputy Stalzer, had arrived. Blumenthal sent him up to the nearby houses to find out if criminal activity was occurring there. Blumenthal then asked Robert if he was carrying any weapons. Robert said he had a knife in his left front pocket. Robert was then placed under arrest.

Blumenthal testified the reason he handcuffed Robert was that there were three street gangs in San Marcos and what Robert was wearing was consistent with those gangs. He testified that the gangs favor baggy clothing because it is easier to conceal weapons.

The juvenile court denied the motion to suppress with the following findings:

> "I think that the [deputy] had probable cause to turn around in the street after he saw somebody in a car bobbing down. There was enough light there on the car for him to see the person in the car, the person bob down, duck down, as the [deputy]'s car went by. The [deputy] made a circle, came back. When he came back to the car, the person was basically doing [furtive] movements in that car. The [deputy] indicated that he saw the person being in the passenger seat of the car and the car's engine was running, and so that gave rise, from my point of view, to a reasonable suspicion that somebody else

3

was in the area and the person in the driver seat is making [a furtive] motion.

"The Court is not really that persuaded by the dress of this particular person as being a reason for him to do anything if that was only there. But the fact that the person bobbed up one time, got back down, and then was kind of bobbing up -- that's [the] impress[ion] the [deputy] gave the Court in testifying -- and the engine was running, and so the [deputy] approached the car. Then he sees a scarf covering the steering wheel area. And I think that the average [deputy] who is out in the street who has seen cars that were stolen, that the starting mechani[sm] is punched and cars are hot[-]wired and all this sort, so the [deputy] said that gave him rise to believe that the car might have been . . . stolen and this was an attempt to conceal the wires showing.

"The testimony isn't that the [deputy] saw the keys initially. The [deputy] said he asked for the keys, because he ordinarily asks for the keys because he recognizes that cars can be hot[-]wired and he wanted to see if there were keys there. The fact that there were keys there did not mean that the car wasn't stolen also.

"Now, you wanted him to rush to see[] whether or not information was in the system that the car was stolen. But to even [have] done that first, if the [deputy] had been concerned about his safety, would not have been dispositive as to whether or not that car had been stolen or not. It might have been stolen and not reported at that point in time.

"And you wanted the [deputy] to further investigate the situation, it appears to me. But the [deputy] couldn't further investigate the matter with the young man being in the car. He said the sister was down the way and all of that. The young man, he didn't show, for example, the registration in the car, say this is my sister's registration, if it was in the car. You see what I'm saying? There was no attempt to show that. So the [deputy] got the young man out of the car.

"There was a lot in this information that was presented to the Court, some of which, you know, really basically sounded like profiling, but in the final analysis it came down to the [deputy] having a need to be concerned about his safety as he did make the investigation. And I think the minor's damning conduct was that he was -- he

4

appeared to have been trying to evade detection by the [deputy]. And the car running, the engine running there, and the minor being in the passenger seat, and that gave, from my point of view, the [deputy] probable cause to detain to attempt to investigate without checking."[1]

DISCUSSION

I

*THE DETENTION WAS LAWFUL*

Robert first contends Blumenthal did not have reasonable suspicion to believe criminal activity was occurring and thus unlawfully detained Robert. We find the officer's observations of the parked car, the location, Robert's furtive movements and the recent rash of burglaries in that area gave the officer sufficient justification to detain Robert in order to investigate further.

A. Burden of Proof and Standard of Review

When evidence is seized without a warrant, the burden is on the prosecution to provide justification for the warrantless seizure. (*People v. Williams* (1999) 20 Cal.4th 119, 136.) Police may temporarily detain a person where the officer has sufficient articulable facts, from which it is reasonable to believe criminal activity may be taking place. Where such detention is reasonable, it may last only so long as it is reasonably necessary to resolve the officer's suspicion. (*People v. Souza* (1994) 9

---

1    On appeal, Robert makes much of the court's use of the term "fervent," which we believe the court intended to say "furtive." Thus we have inserted the term furtive in the trial court's findings.

5

Cal.4th 224, 230; *People v. Russell* (2000) 81 Cal.App.4th 96, 101-102; *Terry v. Ohio* (1968) 392 U.S. 1.)

Appellate courts review the trial court's decision as a mixed question of fact and law. We accept the facts as found by the trial court if they are supported by substantial evidence. We independently apply the law to the facts. (*People v. Glaser* (1995) 11 Cal.4th 354, 362; *People v. Williams* (1988) 45 Cal.3d 1268, 1301.)

### B. Analysis of the Detention.

Sergeant Blumenthal's observations occurred in the early morning hours in a dark location in which there had been a number of recent burglaries, of which he was aware. Robert's furtive movements when Blumenthal passed the car the first time and which were repeated when the patrol car stopped behind Robert's car certainly did nothing to allay his suspicions. Added to these factors, the car was parked with the engine running and a scarf draped over the steering column. It was entirely reasonable for Blumenthal to be suspicious that criminal activity may be in progress and that he needed to investigate further. On the other hand, Blumenthal was alone in a dark area, with no backup and with the reasonable belief that there was another person somewhere in the area.

The fact there may have been a innocent explanation for the activity, does not mean the officer's suspicions were unreasonable. Much like the otherwise innocent behavior observed by the police officer in *Terry v. Ohio, supra*, 392 U.S. 1, the behavior observed here, in light of the officer's training and experience, constituted sufficient justification for the officer to conduct a reasonable investigation. Such investigation, under the circumstances, could not take place until a backup deputy arrived so that the

6

investigation could be safely conducted.  Thus we conclude the juvenile court correctly concluded the initial detention of Robert was lawful.

## II

### *HANDCUFFING ROBERT DID NOT CREATE A DE FACTO ARREST*

Robert contends that when Blumenthal placed him in handcuffs, the detention became an arrest.  If that were the case, there has been no showing of probable cause to justify the arrest.  If, on the other hand, handcuffs did not create an arrest, Robert does not challenge the probable cause to arrest him after he told Blumenthal that he had a knife concealed in his pocket.  Under the circumstances of this case, we find the decision to use handcuffs was reasonable in light of Blumenthal's concern for his own safety pending backup and investigation of possible criminal activities at one of the residences.  Thus while handcuffs can give rise to a finding of custody, their use was not unreasonable under these facts.

### A.  Legal Principles.

In order for a detention to be reasonable it must not last longer than reasonably necessary to complete the investigation which was the purpose of the seizure.  (*United States v. Sharpe* (1985) 470 U.S. 675, 685.)  Police must conduct their investigation with reasonable diligence, using the least intrusive means available under the circumstances. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 384-385.)

The use of handcuffs, or the drawing of firearms during a detention raises a question of whether the detention has become unreasonable in its nature or duration, thus

becoming a de facto arrest, without probable cause. The line between a detention and an arrest can be difficult to draw. (*In re Carlos M., supra*, 220 Cal.App.3d at pp. 384-385.)

The courts have recognized, however, that under appropriate circumstances suspects can be handcuffed and forced to sit on the ground while the investigation is conducted. (*People v. Soun* (1995) 34 Cal.App.4th 1499, 1517.) In *People v. Celis* (2004) 33 Cal.4th 667, 674-676, the court approved a detention of a suspect where he was handcuffed and required to sit during the investigation which followed. Determining the reasonableness of the use of restraints during a detention requires examination of the facts known to the officer and whether such restraints were appropriate under the circumstances. (*Id.* at p. 675; *People v. Stier* (2008) 168 Cal.App.4th 21, 27-28.)

## B. Analysis

As we have noted, this detention occurred at night in a dark area, where the officer was alone. It reasonably appeared to the officer that there was another person somewhere in the area in which he believed a burglary may have been in progress. The officer testified he was concerned for his safety given the location, the possible crimes at issue, the indication of a second person, and the suspect's clothing, which was consistent with that worn by street gangs in the area. He was concerned that the suspect might have a weapon concealed in the baggy clothing.

Sergeant Blumenthal testified he handcuffed Robert before the backup deputy arrived and that he did so for his personal safety. The trial court credited Blumenthal's testimony about his suspicions regarding possible crimes. And, although the court was not greatly impressed with the significance of the suspect's clothing, the court was

8

convinced that Blumenthal used handcuffs under the circumstances for legitimate safety concerns.

Finally, we note from the record it appears the backup deputy arrived shortly after handcuffs were applied, and that Blumenthal then asked Robert if he had any weapons concealed on his person. Robert said he had a knife in his left pocket. At that point Blumenthal lawfully arrested Robert, thus the continued use of handcuffs remained appropriate and the seizure of the knife, incident to the lawful arrest was proper.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.

9