Filed 4/27/26  P. v. Urrutiaguillen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064569 |
| v. | (Super. Ct. No. 23HF0672) |
| FERNANDO URRUTIAGUILLEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge. Affirmed.

Jo Pastore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General,

Collette C. Cavalier and Emily Reeves, Deputy Attorneys General, for Plaintiff and Respondent.

*　　　　　*　　　　　*

Defendant Fernando Urrutiaguillen appeals the trial court's judgment, specifically challenging denial of his motion to suppress evidence obtained during a search of his vehicle in the course of a traffic stop. The trial court found there was reasonable suspicion warranting further investigation, the scope of the search did not exceed the verbal and written consent given by Urrutiaguillen, and there was probable cause for the search. We find there is substantial evidence to support the trial court's determinations and therefore affirm.

FACTUAL AND PROCEDURAL HISTORY

A.     *The Traffic Stop*

On April 18, 2023, Officer Justin Lopez was on duty, in uniform, driving his marked patrol car northbound on the I-5 freeway in Irvine, California, with his K-9, Astro. He initiated a traffic stop of a Jeep Grand Cherokee driven by Urrutiaguillen because he observed it traveling about 70 miles per hour and following the truck in front of it too closely. Urrutiaguillen followed Lopez's instructions in stopping the vehicle.

Lopez approached the Jeep on the passenger side and immediately smelled a strong odor of gasoline. He began the encounter by telling Urrutiaguillen the reason for the stop. Urrutiaguillen provided his Arizona driver's license and registration but no proof of insurance. Lopez gave the license and registration to Officer Gabriel Blanco, a backup officer assisting him that day; Blanco ran a check to see if the license was valid and for outstanding warrants. Those checks came back clear. The process took approximately three minutes.

2

While Blanco was checking the documents, Lopez had conversations with both Urrutiaguillen and his wife. During those conversations, Lopez noted Urrutiaguillen was nervous and was "gripping the steering wheel with both hands very tightly," hanging onto it as if he "didn't want to let go." Lopez asked Urrutiaguillen why he was nervous. Urrutiaguillen responded, "he was nervous because he didn't have insurance." Urrutiaguillen's wife, sitting in the passenger seat, stated that he had recently been terminated from his job in corrections. There were three children in the back seat.

During his initial conversation, Lopez did not ask any questions about the vehicle smelling like gasoline. He asked where they were coming from and where they were going. Urrutiaguillen said they were traveling from Tecate, Mexico to his aunt's house in Los Angeles, expecting to return to Mexico the next day. This information was corroborated by Urrutiaguillen's wife in a separate conversation with Lopez about nine to ten minutes into the traffic stop.

About 11 to 12 minutes into the stop, Lopez asked Urrutiaguillen where he lived, where he purchased the car, and whether there was anything illegal in it. Lopez then asked if he could search the vehicle "real quick," and Urrutiaguillen gave his verbal consent. Before Lopez conducted the search, Urrutiaguillen also signed a written consent form. The family then got out of the vehicle. At this point, Lopez still had not said anything to any member of the family about the car smelling like gasoline.

Lopez retrieved his K-9, Astro, from his marked patrol car about 16 minutes into the stop. Astro walked around Urrutiaguillen's vehicle and alerted near the left rear passenger door seam on the exterior. Lopez opened the back door of the vehicle; Astro entered the vehicle and alerted again.

Astro placed his two front paws on the left rear passenger floorboard and stared down towards the left rear passenger seat.

Lopez then conducted a full search of the vehicle. Around this time, Lopez said, "it kind of smells like gasoline in here" and noted the odor was much stronger in the rear passenger area. This was the first time during the traffic stop Lopez had verbalized anything about the smell of gasoline. Several minutes later, he again mentioned the smell, saying "'it reeks in here right?'"

About 32 minutes into the stop, Lopez asked Urrutiaguillen why the vehicle smelled like gasoline. Urrutiaguillen responded he ran out of gas in Tecate and the gas can had spilled in the back area of the vehicle.

Lopez investigated the fuel tank, hitting it with the palm of his hand. He testified, "It felt very dense like if it was completely full, but the gas gauge was only half full." Lopez also noted that the undercarriage of the vehicle was covered in dried mud except for several screws holding the fuel tank in place. The screws had tool marks, and there was no mud on the screws.

Lopez then called another unit to bring a fuel tank scope to the scene. The unit arrived approximately 20 to 30 minutes later. A "probe" was fed into the gas tank, and the camera showed a white rectangular package inside the tank. The package was consistent with Lopez's experience related to the transportation of controlled substances. After this on-scene examination, the vehicle was towed. A few hours later the fuel tank was accessed from the undercarriage, and several packages were removed from the tank. These packages were consistent with what Lopez had observed on the screen of the fuel tank scope. They contained methamphetamine and heroin, which formed the basis of the charges against Urrutiaguillen.

4

*B.      Officer Lopez's training*

Lopez received training in drug trafficking, including courses on smuggling and commercial interdiction. Lopez is a member of the California Narcotics K-9 Association which also puts on two-to-three-day training courses related to K-9 and narcotics detection. His training focused more on drug trafficking as opposed to drug deals in the streets. It included training on drug trafficking within the United States and on an international level, how controlled substances are sometimes smuggled into the United States, and an overview of drug trafficking operations. As part of his current assignment, he typically investigates drugs coming into the United States from Mexico.

Lopez's training included how drugs could be concealed in a vehicle, and specifically within a gas tank. He observed and participated in a search at a tow yard and on another traffic stop. He was taught that the smell of gasoline in a car "can be an indicator of possible criminal activity" because it can be consistent with the gas tank being tampered with. Lopez testified, based on his training and experience, that a strong odor of gasoline coming from the interior of a passenger vehicle with a family inside is unusual.

Lopez also received K-9 training. Before he became a police officer, Lopez was in the military and his service included training and work handling K-9s searching for explosives. As part of his training as a police officer, Lopez and his K-9, Astro, attended a certified K-9 school put on by the California Highway Patrol in Sacramento. During this training, Astro was trained to detect odors of cocaine, methamphetamine, heroin, and marijuana.

This CHP K-9 training included dog handling, patrol, and narcotics detection training. Astro went through 200 hours of specific drug

5

detection training and had to meet a minimum proficiency to be allowed to work in the field. Lopez and Astro received their initial certification at the academy; both are required to be recertified on an annual basis.

When Astro detects one of the drug odors for which he is trained, he has a definitive or recognizable change of behavior. He goes into his "final response," which is a "passive stare." Lopez described Astro's final response as a physical and mental response, or heightened emotional state, noting Astro's change in behavior is specific to him. Lopez explained dogs are trained to have a specific stop and stare response, but the definitive alert behavior is unique and different to every handler and their dog. He testified, "[t]hey're dogs . . .not robots." Training stresses that the K-9 handler pay attention to his dog and learn what their change in behavior is. Astro's "passive stare [is] his trained final response." It is the same thing as a "freeze alert" another dog might perform.

## C. Procedural History

Urrutiaguillen was arrested and charged with possession of controlled substances (methamphetamine) for sale in violation of Health and Safety Code sections 11378 (count 1) and 11379, subdivision (a) (count 2), possession of narcotics (heroin) for sale in violation of Health and Safety Code sections 11351 (count 3) and 11352, subdivision (a) (count 4). The information alleged sentencing enhancements pursuant to Health and Safety Code section 11370.4, subdivision (b)(4) (as to counts 1 and 2) and subdivision (a)(1) (as to counts 3 and 4).

Urrutiaguillen brought a motion to suppress, and the hearing on this motion included two days of testimony. The trial court denied the motion. Urrutiaguillen then pled guilty to all charges and admitted all

allegations. He was sentenced to a term of three years in county jail, followed by five years mandatory supervision.

Urrutiaguillen filed a timely notice of appeal.

## DISCUSSION

Urrutiaguillen challenges the trial court's denial of his suppression motion on three grounds: (1) the traffic stop was unlawful and unlawfully prolonged without reasonable suspicion of criminal activity; (2) the scope of the search exceeded Urrutiaguillen's consent; and (3) probable cause did not support the scope of the search. We conclude there is substantial evidence to support the court's factual findings. Based on those findings, the court did not err in denying Urrutiaguillen's motion to suppress evidence.

## I.

### STANDARD OF REVIEW

"In ruling upon a motion to suppress, the trial court judges the credibility of the witnesses, resolves any conflicts in the testimony, weighs the evidence, and draws factual inferences. We will uphold the court's express and/or implied findings on such matters if they are supported by substantial evidence, but we independently review the application of the relevant law to the facts." (*People v. Williams* (2006) 145 Cal.App.4th 756, 761.)

## II.

### THE INITIAL STOP WAS NOT UNREASONABLY PROLONGED, AND THERE IS SUBSTANTIAL EVIDENCE ANY DELAY WAS SUPPORTED BY REASONABLE SUSPICION

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures by law enforcement. (*Terry v. Ohio* (1968) 392 U.S. 1, 8–9.) "The United States Supreme Court has

7

interpreted the Fourth Amendment as requiring state and federal courts to exclude evidence that government officials obtained in violation of the amendment's protections." (*People v. Williams* (1999) 20 Cal.4th 119, 125.)

"Ordinary traffic stops are treated as investigatory detentions" and do not violate the Fourth Amendment when the officer can articulate specific facts justifying the stop. (*People v. Hernandez* (2008) 45 Cal.4th 295, 299.) During traffic stops, officers may take action to address "the 'mission'" of the stop and to "'attend to related safety concerns.'" (*People v. Esparza* (2023) 95 Cal.App.5th 1084, 1094.) In the context of a traffic stop, an officer's mission is to enforce the traffic code and ensure "'vehicles on the road are operated safely and responsibly.'" (*People v. Gyorgy* (2023) 93 Cal.App.5th 659, 670 (*Gyorgy*).) Tasks associated with this mission include checking the driver's license, registration, and proof of insurance, and determining whether the driver has any outstanding warrants or criminal history. (*Ibid.*) While the mission of the traffic stop is ongoing, the officer is permitted to talk to the driver and passengers, gather information related to the traffic stop, and make observations. (*Rodriguez v. United States* (2015) 575 U.S. 348, 355 (*Rodriguez*).) An officer does not need reasonable suspicion to conduct this type of inquiry. (*People v. Gallardo* (2005) 130 Cal.App.4th 234, 238.) "A seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." (*Rodriguez, supra,* at pp. 350–351.) The officer's authority for a traffic stop ends when the mission is completed or should have been completed. (*Id.* at p. 354.) "[T]he question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly." (*People v. Russell*

(2000) 81 Cal.App.4th 96, 102.) Information discovered during this type of inquiry "may provide reasonable suspicion to prolong detention." (*Ibid.*)

The Attorney General points to three key pieces of information, each of which established reasonable suspicion to take the next step in the investigation and search. First, there was the smell of gasoline which Lopez testified he noticed as he first approached the vehicle and throughout his initial contact with the driver. Additionally, Lopez noticed Urrutiaguillen was nervous, was not forthcoming about where he currently lived or that he was unemployed, and the family was on a quick turnaround trip from Mexico to Los Angeles. This information prompted Lopez to ask if he could search the vehicle, and Urrutiaguillen gave both written and verbal consent. The consensual search led to Astro's alert at or near the gas tank, and the eventual search of the interior of the gas tank.

Urrutiaguillen argues the time it took to run the license check was less than three minutes, and anything after that initial check was an unlawful prolonging of the traffic stop, which should result in the suppression of anything discovered during that prolonged period. This argument relies heavily on *Gyorgy*, which held an officer's inquiry was not based on reasonable suspicion and he therefore unlawfully prolonged the traffic stop, resulting in suppression of the evidence obtained during the stop. (*Gyorgy, supra,* 93 Cal.App.5th at pp. 676–677.) Urrutiaguillen urges us to reach the same conclusion here based on his assertion that Lopez "detoured from the traffic stop's mission by asking [Urrutiaguillen] questions unrelated to the suspected traffic violation." Urrutiaguillen argues Lopez's inquiries were aimed at finding evidence of criminal wrongdoing rather than being directed to the traffic violation.

In *Gyorgy*, the questions asked by the officer were not related to the traffic stop. The officer asked about the driver's parole or probation status, whether he had weapons, and whether he was a narcotics or sex offender registrant. (*Gyorgy*, *supra*, 93 Cal.App.5th at p. 664.) The officer asked the defendant to get out of his vehicle for a pat down, and waited for backup to conduct the body search, which revealed no illegal items. (*Id.* at p. 665.) The officer then claimed he had the right to walk his K-9 around the defendant's car, though the defendant did not give consent for a vehicle search. (*Ibid.*) The K-9 alerted after circling the vehicle several times. (*Id.* at p. 666.)

The *Gyorgy* court found the stop was unreasonably prolonged because there was no evidence the officer took steps to conduct the mission of the traffic stop and instead "detoured from [it] almost immediately," to investigate unrelated matters without reasonable suspicion. (*Gyorgy, supra*, 93 Cal.App.5th at p. 672.) The officer did not verify the defendant's driver's license, check his registration or insurance or run a warrants check. (*Ibid.*) Also, the K-9 search was unrelated to the officer's stated mission of determining the defendant's sex offender status, and there was no reasonable suspicion of controlled substances or other illegal items. (*Id.* at pp. 675–676.)

To establish reasonable suspicion, a detaining officer must be able to articulate facts which, in the totality of the circumstances, objectively point to criminal activity. (*Gyorgy*, *supra*, 93 Cal.App.5th at p. 675.) The stop cannot be based on """mere curiosity, rumor, or hunch.""" (*People v. Espino* (2016) 247 Cal.App.4th 746, 757.) Urrutiaguillen argued below that Lopez's inquiry and search of the vehicle were a hunch unsupported by reasonable suspicion. We disagree.

10

The determination of whether Lopez had reasonable suspicion to prolong the stop hinges on the factual dispute of whether he smelled gasoline in the vehicle during his initial contact with the driver, or if he noticed it later. Lopez testified the smell immediately triggered his suspicion that controlled substances might be in the vehicle. His drug trafficking training told him the smell of gasoline could be an indication that there were controlled substances in or near the gas tank. This prompted his questions to Urrutiaguillen and his wife while the records check was taking place. During this inquiry, Lopez noted Urrutiaguillen was nervous, and the answers to his questions gave him more reasonable suspicion to continue his inquiry by conducting the K-9 search, which ultimately led to the discovery of the controlled substances.

Urrutiaguillen argues the evidence shows Lopez smelled gasoline only after Astro alerted in the back seat of the vehicle based on the fact that Lopez first mentioned the smell to Urrutiaguillen after Astro's alert. Additionally, Urrutiaguillen relies on Lopez's report of the traffic stop, which states the gasoline smell was detected when Lopez was conducting the vehicle search.

Urrutiaguillen concedes Lopez testified he smelled gasoline as he approached the car but argues Lopez's testimony is not credible because he later admitted on cross-examination that his report only mentions the smell of gasoline at the time of the K-9 search. The portion of the record to which Urrutiaguillen cites is testimony where Lopez admits the contents of his report (that he smelled a strong odor of gasoline when he entered the vehicle) but does not recant his testimony that he smelled gasoline immediately upon approach. Urrutiaguillen describes Lopez's testimony as "a post-hoc fabrication meant to justify the otherwise illegal prolonged detention."

11

In ruling on a motion to suppress evidence, the trial court may weigh evidence, determine credibility and resolve conflicting fact questions. (*People v. Williams*, *supra*, 145 Cal.App.4th at p. 761.) When there is substantial evidence to support the court's determination, it will be upheld. (*Ibid.*) The court accepted Lopez's testimony as credible, and found when combined with his training, the smell of gasoline could create reasonable suspicion, especially when considered with all the other factors present.

Once that factual determination was made, the trial court did not "feel any of the other questions were of a nature where they were born of an interrogation, nor did they appear to rise to the level of a hunch or a fishing expedition." The questions "were born of an independent pathway that the officer appeared to be allowed and did pursue." That pathway came from the smell of gas at the initial contact with the vehicle, and that allowed the officer to gather other information that led to "reasonable suspicion [of] criminal activity." Based on these factual findings, the court found the detention was not prolonged. We agree.

Urrutiaguillen next argues that Lopez's descriptions of Urrutiaguillen's nervousness were not severe enough to form the basis of reasonable suspicion to continue the traffic stop. Nervousness can be "'a pertinent factor in determining reasonable suspicion.'" (*People v. Flores* (2024) 15 Cal.5th 1032, 1045.) Nervousness can be in the form of "expressions of shock upon seeing an officer, ducking and hiding, headlong flight, a sudden change in direction, walking quickly away while looking back at the officer, and failing to acknowledge the officer's attempt to engage the suspect." (*Id.* at p. 1044.) A person's nervousness during a police encounter may inform reasonable suspicion if it is "unusually extreme or prolonged." (*U.S. v. Ludwig* (10th Cir. 2011) 641 F.3d 1243, 1250.) Urrutiaguillen argues Lopez

did not specifically testify that the observed nervousness was unusually extreme or prolonged and that motorists engaging with law enforcement are often nervous. Moreover, Urrutiaguillen argues, there was a valid reason for his nervousness communicated to Lopez: the lack of proof of insurance.

Lopez testified Urrutiaguillen was "gripping the steering wheel with both hands very tightly," and looked as if he "didn't want to let go." Urrutiaguillen does not challenge the veracity or credibility of this evidence, only that it does not rise to the required level of nervousness to form the basis of reasonable suspicion.

Even without any nervousness by Urrutiaguillen, Lopez had information which gave him reasonable suspicion to continue the stop: the smell of gasoline inside the vehicle, the quick turnaround trip from Mexico to Los Angeles, and Urrutiaguillen's evasion of questions about his current residence. Each of these creates circumstances which, when considered together, can form the basis of reasonable suspicion. If Lopez's only information was the description he gave of Urrutiaguillen's nervous behavior, it might not rise to the level of "unusually extreme or prolonged," but when considered as part of the totality of the circumstances, reasonable suspicion is established.

Finally, Urrutiaguillen argues that his connections with Mexico and a day trip to visit family in Los Angeles cannot form the basis for a "reasonable, particularized suspicion that he was transporting drugs, *in the absence of further information*." (Italics added.) Urrutiaguillen compares this to the *Gyorgy* court's finding that the presence of the defendant's truck at a motel known for drug trafficking was not enough to establish a reasonable suspicion that the defendant was involved with drug trafficking. (*Gyorgy*, *supra*, 93 Cal.App.5th at p. 676.) But here, there is more than just the

13

knowledge Urrutiaguillen and his family were driving from Mexico to Los Angeles for a short "turnaround trip." There was also his nervousness, his unemployment, questionable living situation, and the smell of gasoline, all of which create a totality of circumstances which can form the basis of reasonable suspicion. The trial court noted that this case does not turn on one isolated factor. It cannot be said "hey, because you're unemployed, you must be a drug dealer." The court stated all information presented to Lopez must be considered "from a reasonable standard point of view" to determine "were they sufficient to allow the officer to do what he did and conduct additional investigation to determine whether the defendant was transporting anything illegal in his car, specifically in the fuel tank." We agree.

III.

THE SCOPE OF THE SEARCH DID NOT EXCEED URRUTIAGUILLEN'S CONSENT,

AND THERE WAS PROBABLE CAUSE FOR THE SEARCH

Urrutiaguillen argues the scope of his vehicle search exceeded the consent he gave, and the search is therefore in violation of the Fourth Amendment. Lopez requested a "real quick" search of the vehicle, and Urrutiaguillen argues a reasonable person would not assume that includes waiting for someone from another agency to bring a scope to the scene to search the interior of the gas tank.

A search unsupported by a warrant, probable cause, or an exigent circumstance is valid only when there is purported consent. (*Florida v. Royer* (1983) 460 U.S. 491, 497 (*Royer*).) There was no warrant in this case, and there is no argument the search was based on exigent circumstances. Therefore, unless there is either consent or probable cause, the evidence must be suppressed. We find there is substantial evidence of both here.

*A.* *The Search Did Not Exceed the Scope of Urrutiaguillen's Consent*

"[T]he search must be limited in scope to that which is justified by the particular purposes served by the exception." (*Royer, supra*, 460 U.S. at p. 500.) "Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances." (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408 (*Crenshaw*).) A consensual search may not legally exceed the scope of the consent supporting it. (*Walter v. United States* (1980) 447 U.S. 649, 656–657.) Generally, consent to search a vehicle includes authority to search "all compartments in the automobile and . . . any containers found within those compartments." (*People v. Williams* (1980) 114 Cal.App.3d 67, 73.)

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (*Florida v. Jimeno* (1991) 500 U.S. 248, 251.) Urrutiaguillen argues Lopez set the scope of the search by calling it a "real quick" look and a typical reasonable person would not interpret that phrase "to include dismantling vehicle components or conducting a canine search."

Urrutiaguillen relies on *People v. Cantor* (2007) 149 Cal.App.4th 961 (*Cantor*) in support of his argument that the scope of this search exceeded the level of consent he gave. In *Cantor*, the Court of Appeal reversed the denial of the defendant's motion to suppress evidence, finding the search of a vinyl record cleaner located in the trunk of defendant's vehicle exceeded the scope of consent. (*Id.* at pp. 967–968.) There, officers searched the passenger compartment, the trunk, under the hood, and rechecked the car's interior several times. After all of that, the defendant agreed to a K-9 search,

15

and in the process of removing items from the trunk which could harm the dog, the officer felt something shift in a box he was holding, opened the box with a screwdriver, and found cocaine. (*Id.* at p. 964.) The *Cantor* court stated, "Once [the officer's] exhaustive search of all compartments of the car revealed no contraband, defendant's consent ended. No justification existed to prolong defendant's detention." (*Id.* at pp. 965–966.)

*Cantor* involved verbal consent only, but here, Urrutiaguillen gave Lopez both written and verbal consent to search his vehicle. Additionally, there is nothing in the record which shows Urrutiaguillen made any attempt to limit the scope of consent, withdraw his consent, or intervene in the search.

In *Crenshaw, supra,* 9 Cal.App.4th 1403, the defendant knew the officers were looking for drugs in his vehicle. The Court of Appeal found it was objectively reasonable to search places a reasonable person would expect to find drugs, including inside a door panel in the defendant's vehicle. (*Id.* at pp. 1414–1415.) Urrutiaguillen argues his case is unlike *Crenshaw*, because there the defendant knew the officers were looking for drugs, but here, Lopez never told Urrutiaguillen what he was looking for. Therefore, Urrutiaguillen could not give a fully informed consent and, without that information, the search of the inside of his gas tank was not objectively reasonable and exceeded the scope of his consent.

The record here indicates Lopez asked Urrutiaguillen if he had anything illegal in the car, and specifically mentioned narcotics, marijuana, heroin, cocaine, or methamphetamine. Urrutiaguillen denied there were any such substances in his vehicle. Additionally, Lopez said, "I don't want to have to take apart your car anything like that. You got anything in there bro?" Urrutiaguillen then responded, "You do, you do whatever you have to do, sir."

Urrutiaguillen knew the scope of the search could and would likely be expanded beyond a "quick" look. Urrutiaguillen's statement, "You do, you do whatever you have to do, sir" is verbal consent to continue the search and specifically allows for a search of the gas tank.

The trial court noted "[i]t should not have been a surprise to a reasonable person that that's where the inquiry and where the search was going to go towards." We agree. Urrutiaguillen was aware of the object of the search and the intended scope of the search. He did not withdraw consent, and there is substantial evidence he gave further or expanded consent by telling Lopez to "do whatever you have to do, sir."

B.      *There Was Probable Cause to Search the Gas Tank*

Presuming consent was not initially valid, or was at least exceeded, Urrutiaguillen argues Astro's alert was questionable, meaning there was no probable cause to conduct the search of the gas tank.

Probable cause is a higher standard than reasonable suspicion, and it can be found "'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found . . . .'" (*People v. Lee* (2019) 40 Cal.App.5th 853, 862.) In evaluating whether probable cause exists the court must consider the totality of the circumstances. (*Ibid.*) Even without consent, an officer can conduct a warrantless search of a vehicle if the officer has probable cause to believe the vehicle contains contraband or evidence of criminal activity. (*Id.* at pp. 861–862.) An officer with probable cause "'may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view.'" (*People v. McGee* (2020) 53 Cal.App.5th 796, 801.)

17

Urrutiaguillen concedes that a K-9 alert is sufficient probable cause to search a vehicle, but in his motion, he challenged the validity of Astro's alert by presenting evidence from an expert on K-9 behavior. Specifically, Urrutiaguillen challenges Lopez's testimony that Astro's "passive stare" is a trained response he considers to be an alert, even if there is not a full final "freeze." The expert testified that none of Astro's responses was an actual alert, and when Astro was walking around the vehicle he was not actively searching and therefore could not "alert." The expert also testified Astro did not alert inside the vehicle, that Lopez was too close to the dog, and he called the "freeze" too quickly.

Urrutiaguillen also relies on Lopez's testimony that Astro was limping on scene, and he pulled out a "sticker" embedded in the animal's paw. When the sticker was removed, Astro stopped limping. Urrutiaguillen appears to argue the court could infer this caused a false alert, but no evidence supports that inference.

The trial court found the K-9 alert "corroborated the officer's reasonable suspicions that were further corroborated by him knocking on the tank a few times and recognizing a sound that was just not consistent with a full gas tank." Additionally, while the court found the defense expert was qualified, it "found the testimony lacked foundation and relevance as to the underlying specifics of [Lopez] and his dog specifically as to the training they received, not only in the K-9 academy, but also the subsequent training that they received." The expert's testimony relied on general training and practices, and the court found Lopez's testimony about his relationship with Astro and his ability to interpret Astro's particular behavior to be more credible. Substantial evidence supports this finding. Based on this finding, the court found "the officer had probable cause to search [Urrutiaguillen's]

18

gas tank." The court further found that it was reasonable for Lopez to wait for the scope from another agency "based on reasonable articulable facts that were given to the officer at that time." We agree.

DISPOSITION

The judgment is affirmed.

BANCROFT, J.*

WE CONCUR:

MOORE, ACTING P. J.

GOODING, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.